**Brian C. CARPENTER and Kendra Carpenter, Plaintiffs–Appellants,**

**v.**

**CHRYSLER CORPORATION, et al., Defendants–Respondents.**

**Nos. 60379, 60380.**

Missouri Court of Appeals, Eastern District, Division Three.

April 27, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 25, 1993.

 .

 ˊ

David S. Purcell, Susan A. Jotte, St. Louis, for plaintiffs-appellants.

Andrew George Neill, Charles A. Newman, Gordon L. Ankney, James W. Erwin, Victor Scott Williams, St. Louis, for defendants-respondents.

STEPHAN, Judge.

Brian and Kendra Carpenter appeal from the judgment of the trial court ordering a new trial in favor of Chrysler Corporation ("Chrysler") and Scott Auto Sales and Finance Company d/b/a Chrysler–Plymouth West ("CPW"). This case arises out of the Carpenters' dissatisfaction with a new 1986 Chrysler LeBaron automobile they purchased at CPW in August 1986. The Carpenters subsequently learned that, prior to their purchase, their car had been driven some distance with a disconnected odometer. The Carpenters then sued Chrysler and CPW.

In their third amended petition, filed January 11, 1991, the Carpenters sought recovery against Chrysler and CPW in five counts. The various counts alleged the following: 1) statutory odometer fraud with damages sought pursuant to Section 407.546, RSMo Cum.Supp.1992 (in effect since 1989), Missouri's odometer altering statute, and pursuant to 15 U.S.C. Section 1981; 2) breach of express warranty under Missouri's New Motor Vehicle Warranties, Nonconformity Act, Sections 407.560–407.-579 RSMo 1986 (Missouri's "Lemon Law") seeking rescission of the contract; 3) breach of contract seeking recovery of the full purchase price as damages; 4) entitlement to a declaratory judgment for removal of a lien on the car; and 5) fraudulent misrepresentation.

The trial court directed a verdict in favor of CPW on count one at the close of the Carpenters' opening statement with plaintiffs' consent. The Carpenters withdrew their allegation of odometer fraud in count five against CPW only, not Chrysler. The Carpenters then submitted their action to the jury against Chrysler on their first count for statutory odometer fraud and count five for fraudulent misrepresentation. The jury awarded the Carpenters $3,400 on count one and $3,400 actual and $1.19 million punitive damages on count five against Chrysler.

In the Carpenter's submission to the jury against the car dealer CPW the jury awarded the Carpenters $7,200 for breach of warranty and $3,400 actual and $17,000 punitive damages for fraudulent misrepresentation on count five.[1] The jury also found in favor of the Carpenters on CPW's counterclaim against the Carpenters for nonpayment under the installment sales contract. The Carpenters appeal from the judgment entered by the trial court granting the motions for new trial filed by Chrysler and CPW. We reverse and remand the grant of a new trial in favor of CPW; affirm the grant of a new trial in favor of Chrysler and affirm the denial of judgment notwithstanding the verdict.

The Carpenters have raised over twenty-three points and twenty-eight subpoints.

---

1. The record does not clearly reflect whether the Carpenters' submission against CPW for breach of warranty was under count two or three. Count three's allegations incorporated count two *in toto*, blurring the distinction between the two counts. Count four is mentioned nowhere in the record, apparently abandoned by the Carpenters.

## 352

These points, in summary, raise issues concerning: 1) jurisdiction of the trial court to grant Chrysler's motion for new trial; 2) the propriety of a new trial on weight of the evidence grounds; 3) jury bias; 4) admission of certain evidence; 5) certain instructions; 6) punitive damages; 7) election of claims and remedies; 8) closing argument; and 9) measure of damages. Respondents themselves have raised an additional issue. They each challenge the submissibility of the Carpenters' case.

■ At the outset we dispose of the Carpenters' jurisdictional attack on the timeliness of Chrysler's motion for new trial, which in turn affects the timeliness of appeal and, hence, our jurisdiction. Appellants contend that the trial court lacked jurisdiction to rule on Chrysler's motion for new trial. The jury returned its verdict on February 8, 1991. CPW filed its motion for new trial on February 22, 1991. Chrysler filed its new trial motion on February 25, 1991, which, because of an intervening weekend, was still within the fifteen days required under Rule 78.04. Thus, both motions were timely filed under Rule 78.04.

■ The trial court ruled on CPW's new trial motion on May 23, 1991; on Chrysler's, on May 28, 1991. Appellants claim that, once CPW filed its motion for a new trial on February 22, the trial court had ninety days up to and including May 23 under Rule 81.05 to rule on *all* post-trial motions. Appellants conclude that the trial court was without authority on May 28 when it ruled on Chrysler's new trial motion because the ninety day period had expired on May 23 when the trial court ruled on CPW's new trial motion.

Appellants cite Rule 81.05 which provides that "in the event a motion for a new trial is timely filed, the judgment becomes final at the expiration of ninety days after the filing of such motion or, if such motion is passed on at an earlier date, then at the date of disposition of said motion." Appellants emphasize Rule 81.05's language that "[a]ny authorized after-trial motion not passed on at the time the motion for new trial is determined shall be deemed overruled as of the same date." Based upon

Rule 81.05, appellants conclude that the trial court's ruling on CPW's motion for new trial effectuated an automatic denial on Chrysler's pending new trial motion.

Appellants' argument is novel. Our research has disclosed no case dispositive of this issue. To accept appellants' strict reading of Rule 81.05 would compel the trial court to simultaneously dispose of all new trial motions in multi-party litigation, even when several new trial motions are filed by different parties at different times, albeit timely. Appellants' view of Rule 81.05 would result in shortening the ninety day period within which the trial court retains control of its judgment under Rule 78.06 for its consideration of subsequently-filed yet timely new trial motions.

We do not believe our Missouri Supreme Court promulgated its rules to create any such impediment to the decision-making process of the trial court. Under *Kattering v. Franz*, 231 S.W.2d 148 (Mo.1950), cited by both parties, "[o]ne of the purposes of the 1943 Code of Civil Procedure was to speed up litigation ... [and] ... was particularly intended to eliminate delay in the period after judgment in the trial court. That was the reason for ... fixing limited periods for filing and acting on motions for new trial." *Id.* at 149. That purpose is not thwarted by permitting the trial court a full ninety days following a timely new trial motion to consider its ruling on the motion. The Rules specifically allow the fifteen days to file a new trial motion and ninety days for the trial court to rule on it, for a maximum of 105 days. Rules 78.04; 78.06; 81.05(a). Reading the Rules *in pari materia* suggests that Rule 81.05's provision that "[a]ny authorized after-trial motion not passed on at the time the motion for a new trial is determined shall be deemed overruled as of the same date" should be construed to mean any authorized after-trial motion filed by the *same* party. Such a reading affords the trial court the full period prescribed by the Rules in reviewing the merits of all timely-filed new trial motions of *all* parties involved in more complex litigation. The maximum of 105 days is not exceeded by

our construction. We hold that where two or more timely motions for new trial are filed by different parties in a case, a ruling on the earlier-filed motion does not operate as an automatic denial of the remaining new trial motions filed by a different party. Thus, the trial court had jurisdiction to decide Chrysler's timely new trial motion. Having decided the trial court properly retained jurisdiction, the Carpenters' notices of appeal to each order, filed June 3 and 7, 1991, respectively, are also timely and we have jurisdiction of the appeal of the trial court's judgment. We now consider the circumstances giving rise to this litigation.

The facts, despite protracted litigation spanning nearly four years and resulting in a voluminous record of more than 1500 pages in the legal file and over 900 pages of transcript, are fairly straightforward. CPW, an automobile dealer in west St. Louis County, Missouri, had received the car at issue here, a 1986 Chrysler LeBaron, from Chrysler's Detroit, Michigan plant in February 1986. In March 1986 CPW discovered a leak in the power steering system of the LeBaron while it was sitting on CPW's sales lot. CPW replaced a seal in the power steering unit and refilled the car's power steering fluid. In April 1986 Chrysler sent CPW a recall notice and repairs kit to correct a wiring harness defect causing intermittent failure to start. However, CPW did not make the repair.

On August 25, 1986, Brian Carpenter ("Carpenter") went to CPW to buy two cars, one for himself and another automobile primarily for the use of his older daughter Kendra, then sixteen, as well as his fifteen year old daughter Kerry. He told the salesman he wanted a reliable car for his daughters. The salesman directed Carpenter's attention to the Chrysler LeBaron stating it was a reliable car. Carpenter did not test-drive the car because it would not start. The salesman attributed the difficulty to a dead battery. Nevertheless, Carpenter signed a sales contract that day to buy the LeBaron. The salesman told him the car would be taken care of and would be ready in two days. Carpenter left.

The next day, on August 26, 1986, CPW noted a "powerless steering" problem on the LeBaron and made repairs adjusting a valve and some belts and putting power steering fluid in the car. A mechanic at CPW inspected the car and prepared a vehicle inspection certificate on August 26 indicating that the odometer recorded sixteen miles and that the car was in good mechanical order. CPW also replaced the steering gear on August 28, 1986.

Later that same day Carpenter returned to the dealer for his new car. CPW told him the LeBaron had needed alignment and was available at Firestone. Carpenter handled some paperwork and then picked up the LeBaron at Firestone. In order to finance his purchase, Carpenter traded in his Plymouth Reliant for a $2,000 credit and financed the balance of $17,268 under a retail installment contract. Carpenter also paid a $690 premium to purchase credit life insurance; $1,072.84 for credit disability insurance and $497 for an extended warranty or service contract.

Carpenter began experiencing problems with the car almost immediately after his purchase. He returned the car to CPW on September 1, 1986, complaining of problems with the power steering, ignition, leaky oil and the electronic dash display. CPW replaced the power steering pump and ignition switch. Carpenter picked up the car September 4. He returned it one week later on September 11, 1986, because of persistent oil leaks. CPW replaced seven items.

Carpenter continued to experience problems with the car's power steering, oil leaking and digital dash display. He returned the car a third time to CPW on September 17. CPW removed the transmission and replaced the torque converter with a rebuilt assembly, replaced the oil pump and sent the car again to Firestone for realignment. Carpenter retrieved the car September 25.

The car's digital display gauges remained erratic, the steering "pulled" and, frequently, the car would not start in park, but would have to be started in neutral. On several occasions the car failed to start at all. Carpenter complained repeatedly to

CPW and asked that the car be replaced. He took the car in for repairs several times in October and November, but no further work was done by CPW on those occasions.

In November Carpenter received notice of the recall for the defective wiring harness. He took the car to CPW in December for repairs for difficulties with the transmission, the steering, the radio and oil leaking. The car was in the shop from December 1 through December 9. CPW again replaced the torque converter, the speed sensor switch and the entire transaxle. However, CPW did not repair the defective wiring harness.

Despite Carpenter's continued complaints with the car's steering, CPW made no further repairs after those repairs of December 11, 1986, at 4,000 miles. Carpenter's recourse to other dealers provided no satisfaction because they refused to honor the mechanical breakdown protection extended warranty that Carpenter had purchased through CPW. In April 1987 Carpenter notified Mercantile, the assignee of the installment contract on the car, that he intended to make no further car payments because of the car's numerous defects.

In July 1987 Carpenter also received a letter from Lee Iacocca, Chrysler's chairman, informing Carpenter that Carpenter's LeBaron automobile had been utilized in Chrysler's overnight evaluation program while still at the manufacturer's site in Detroit, Michigan, before the car had been shipped to CPW. The Overnight Evaluation Program ("OEP") was a program Chrysler designed to provide an assessment of the function, performance, appearance, safety and quality of its vehicles. A Chrysler employee testified the program had been in effect since at least 1969. Under the program, Chrysler employees drove new Chrysler cars, ready to be shipped, from work to home and back to work in order to evaluate the vehicle's quality. During these test drives the odometers were disconnected. Upon learning of his car's use in the OEP program, Carpenter quit driving the LeBaron sometime in July or August 1987.

A year earlier in June 1986 Morris Munson of the Missouri Department of Revenue had warned Chrysler officials at its Fenton, Missouri plant to halt its practice of disconnecting odometers.

The car was eventually towed on December 14, 1988, to CPW for inspection by its service manager, Carpenter, Carpenter's attorney, an attorney for Chrysler and David Link, an expert witness for Chrysler. Link was a zone technical advisor, a person skilled in assisting dealers with difficult and technical problems with vehicles. Link examined the car and its various defects. He noted CPW had not repaired a wiring harness for which Chrysler had issued a recall in April 1986. Chrysler had also issued a safety recall for a defective fuel line in September 1987 which was not repaired until March 1990, despite this inspection in December 1988.

The car was eventually repossessed while sitting in Carpenter's driveway by CPW which had repurchased the installment car contract from Mercantile Bank. CPW resold the car at a wholesale auction to a used car dealer for $2500. Another customer ultimately bought the car in July 1990 for $5200.

After the jury returned its verdicts in favor of Carpenter and against CPW and Chrysler, the trial court permitted Chrysler to introduce certain federal court records offered by Chrysler in mitigation of punitive damages. These records reflected that Chrysler and two of its executives had been indicted; eventually had entered pleas of nolo contendere to criminal charges as a result of the odometer disconnections; and had paid fines of $7.3 million. In a related civil class action involving multi-district litigation, a settlement was reached. The Carpenters had not been involved in that class action suit.

 Before addressing the merits of the Carpenters' appeal, we must first consider the submissibility issue raised by Chrysler and CPW. Both respondents argue that the trial court should have granted their respective motions for directed verdict and motions for judgment notwithstanding the verdict. A motion for judg-

ment notwithstanding the verdict presents the same issue as a motion for directed verdict at the close of all the evidence: whether the plaintiff proved a submissible case. *Kincaid Enterprises, Inc. v. Porter*, 812 S.W.2d 892, 894–95 (Mo.App.1991). In reviewing a trial court's denial of a j.n.o.v. motion, we consider the evidence in a light most favorable to the party who prevailed on the verdict. *Petry Roofing Supply, Inc. v. Sutton*, 839 S.W.2d 337, 341 (Mo. App.1992). The prevailing party is given the benefit of all favorable inferences reasonably drawn from the evidence. *Id.*

We reiterate that the Carpenters submitted their claims to the jury against Chrysler in Count I for statutory odometer violations; against CPW in Counts II and III for breach of express warranty ("Lemon Law") and breach of contract and against both CPW and Chrysler for fraud in count five.

■ We begin with a scrutiny of the record on the fraud count. The elements of fraud are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or his ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) his right to rely thereon; and, (9) the hearer's consequent and proximately caused injury. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. banc 1988); *DeLong v. Hilltop Lincoln–Mercury, Inc.*, 812 S.W.2d 834, 839 (Mo.App.1991).

The Carpenters argue that they produced substantial competent evidence to meet each of these elements to support a finding of fraudulent misrepresentation against both Chrysler and CPW. We first address the Carpenters' fraud claim against Chrysler. The Carpenters claim that by disconnecting the odometer and in failing to tell purchasers about disconnecting the odometer, Chrysler made a representation about the total mileage on the vehicle which was false. At no point does Chrysler deny that it disconnected the LeBaron's odometer.

The evidence clearly established the first two elements of the Carpenters' fraud action against Chrysler that Chrysler made a representation that was false.

■ Chrysler, however, posits there were serious evidentiary shortcomings with the remaining elements of the Carpenters' fraud case against it such as materiality, scienter, reliance and damages. Chrysler highlights its own evidence that it acted with the good faith belief that its OEP benefitted consumers by permitting detection and correction of actual and potential problems and that its operation of OEP was proper and legal. Regardless of Chrysler's motive, such evidence does not contradict that Chrysler knew that certain automobiles it manufactured were driven with disconnected odometers and that Chrysler did not disclose this fact to its car buyers or dealers. Long ago this court held that "a representation with reference to the mileage of an automobile is a representation with reference to a material fact." *Jones v. West Side Buick Auto*, 93 S.W.2d 1083, 1086[2] (Mo.App.1936). The element of materiality was also satisfied, as well as Chrysler's knowledge of the representation's falsity.

■ Chrysler also attacks evidence of the Carpenters' reliance as too insubstantial to permit submission of the case to the jury. The rule is that, while the plaintiff who complains of the defendant's fraud must show that the false representations made to him by the defendant induced him to act to his prejudice, the fact of his reliance upon such false representations need not invariably be established by direct evidence to that effect, but may be inferred from all the facts and circumstances in the case. *Jones*, 93 S.W.2d at 1087.

■ Chrysler attempts to distinguish *Jones* from this case. Chrysler observes that in *Jones*, the car buyer testified that he had looked at the odometer to determine the number of miles before he decided to buy the car. The court in *Jones* held that the buyer's act of checking the odometer clearly reflected his reliance on its mileage statement to support a case of fraud. *Id.*

Chrysler emphasizes that the Carpenters, unlike the plaintiff in *Jones,* did not look at the odometer in advance. Chrysler also asserts that the sixteen miles on the LeBaron's odometer had no significance on the Carpenters' decision to buy the car because that same day the Carpenters bought a new Plymouth Turismo which had twenty-five miles on its odometer. Nevertheless, none of this evidence refutes the Carpenters' testimony that they would begin to question a vehicle which displayed forty or more miles on its odometer. More importantly, Carpenter had also testified he would not have bought the car had he known the truth concerning the disconnection of the odometer. This testimony satisfies the element of the Carpenters' reliance on the accuracy of the odometer's reading as an indicia of the car's soundness.

The Carpenters' right to rely has not been questioned by Chrysler. The difference between the Carpenters' and Chrysler's relative positions in their ability to ascertain the truth of the odometer readings sufficiently establishes Carpenters' right to rely.

■ The final element for a submissible case of fraud against Chrysler requires the Carpenters' proof of damages proximately caused by Chrysler's misrepresentation. Chrysler persuaded the trial court that the Carpenters incurred no damages as a result of the disconnected odometer. Chrysler notes that Carpenter himself testified to his belief that a speedometer malfunction subsequently caused the car's odometer to register mileage incorrectly so that the vehicle had accumulated up to 17,000 more miles than appeared on the odometer. Chrysler concludes that, as a result, the Carpenters would have been forced at any later sale of the car to disclose that its true mileage was unknown, regardless of the car's inclusion within the OEP. Chrysler further states that no evidence established that the car was worth less than the original $16,999.50 purchase price paid by the Carpenters merely because of the car's use within the OEP.

Richard Diklich, the Carpenters' expert witness, calculated a twenty percent reduction in the car's value because of the unknown true mileage, given the type of vehicle, age and condition and mileage. When asked if whether the true mileage was unknown affected the value of the car at the time Carpenter purchased it in late August 1986, the expert answered as follows:

It affects the value of the vehicle from the standpoint that Mr. Carpenter thought he was buying a low mile for all practical purposes zero mile vehicle, and in addition to that, that true mileage unknown went with the car all the way through its service life and then appeared when the vehicle was sold.

Elsewhere, he testified that as soon as Carpenter had notice from Lee Iacocca's letter of July 1, 1987, that the car's true mileage was unknown, such notice created a liability effectively decreasing the car's market value by twenty percent. The expert added that, given its service history, the market value of the car was about another twenty percent reduction "as of the date of sale of the vehicle." He evaluated its subsequent sale value at a wholesale automobile auction to be about $3,500. The car was sold, in fact, for $2,500, to a car dealer. That car dealer, in turn, resold the car as a repossessed auto for $5,200 on July 19, 1990, to a woman interested in buying a used car.

Diklich, despite Carpenter's belief the mileage had not been accurately recorded, also observed that, unlike an automobile radio, the odometer has a memory clip to insure its accuracy. He also testified generally that anytime "you do a repair on a car it can potentially have a change in the value of the vehicle." His testimony sufficiently established the element of damages to withstand any challenge to the submissibility of the Carpenters' action against Chrysler for fraudulent misrepresentation for disconnection of the odometer.

■ Much of the evidence recounted herein also satisfies a finding that the Carpenters made a submissible case against Chrysler for statutory odometer violation. We deem it unnecessary to review again all the evidence which supported the elements that Chrysler had disconnected the odome-

ter on the LeBaron or operated the LeBaron knowing that its odometer was disconnected or not functioning, that Chrysler's action was done with the intent to defraud, and that the Carpenters were damaged as a result. Chrysler admitted that it had disconnected the odometers, admitted that it had not disclosed this practice to dealers or purchasers (from which the jury might reasonably infer an intent to defraud), and the Carpenters, as in their fraud count, produced testimony that they incurred damages as a result of this practice. Both counts against Chrysler for common law fraud and for statutory odometer violation were supported by sufficient evidence to warrant their submission to the jury for its determination.

CPW has also attacked the submissibility of the Carpenters' case against it on claims of breach of warranty and of fraudulent misrepresentation. We first consider whether the Carpenters made a submissible case under Instruction 14 against CPW for breach of warranty. Instruction 14 in the legal file fails to identify either who tendered it or a MAI notation identifying its source. All instructions refused and all instructions given, including a record of who tendered them and the "MAI" notation, shall be kept as a part of the record in the case before the trial court. Rule 70.-02(d). The same treatment is the preferred practice before this court. *See Gilomen v. Southwest Mo. Truck Center*, 737 S.W.2d 499, 502 (Mo.App.1987). We have reviewed the pattern instructions contained in MAI 4th ed. The Carpenters' verdict director appears to have been drawn directly from MAI 25.07 [1991 Revision] for breach of express warranty under the Uniform Commercial Code.

The Uniform Commercial Code, in Section 400.2–313(1)(a), RSMo 1986, provides that an express warranty is created by an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain. When such a warranty is made, the goods shall conform to the affirmation or promise. *Id.* It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee". Section 400.2–313(2), RSMo 1986. The seller need not have a specific intention to make a warranty. *Id.* An affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty. *Id.* Thus, construing MAI 25.07 and Section 400.2–313 together, in order to make a submissible case of breach of express warranty, a plaintiff must plead and prove the following elements:

1) defendant's sale of the goods to plaintiff;

2) defendant's representation to plaintiff that the goods were of certain kind or quality;

3) defendant's representation induced plaintiff's purchase of, or was a material factor in plaintiff's decision to purchase, the goods;

4) nonconformity of the goods to the representations made;

5) plaintiff's notice to defendant, within a reasonable time of discovery of the goods' nonconformity, of such failure to conform; and

6) plaintiff's damages.

The Carpenters submitted to the jury that CPW had represented the LeBaron was reliable and in good, safe and roadworthy condition. CPW contends that the Carpenters failed to show that CPW made any representations of fact, not merely opinions, or that any representations constituted a material factor in the Carpenters' decision to purchase the Chrysler LeBaron automobile. Thus, CPW disputes that the Carpenters established the second and third elements of a prima facie case for breach of warranty.

In detailing his discussions with the car salesman at CPW, Carpenter testified that he had two daughters and that he and his daughters needed two cars in order for them to get to work and to school and that both he and his daughters would need reliable transportation. He was looking for "something that you could count on." Carpenter testified that when the CPW salesman showed him the LeBaron, the sales-

man said, "it was a good car, reliable, brand new. This might be what you're looking for. This is the kind of car to have." In response to whether the salesman had talked "about success they had had with that type of model of car", Carpenter answered as follows:

He didn't elaborate on any success; just made the insinuations to me this was a new car, reliable, I can count on it. It was the kind of car I wanted to have for the deal I was trying to make.

When asked what the salesman said about his knowledge of customer satisfaction of other similar cars, Carpenter stated: "Yeah, it was a good car, reliable car, that people were satisfied with it." He testified that he told the salesman he intended the car to be used not only by himself but also by his sixteen year old daughter and, eventually, by his fifteen year old daughter as well. The dealer picked this particular car out for him as suitable, told him it was a new car and that it ran right. The salesman, however, never disclosed that the car had any prior mechanical problems. For example, when the car would not start for the test drive the salesman attributed the problem to a dead battery. Carpenter, instead, only test-drove the other car he purchased for himself. CPW also certified the Missouri Motor Vehicle Inspection Report listing the car's mileage. CPW never mentioned to Carpenter that CPW had repaired a leak in the car's power steering earlier that March or that a recall notice for a wiring harness defect had been sent. This testimony capsulizes the Carpenters' evidence against CPW concerning representations or warranties made by CPW when it sold the LeBaron to the Carpenters.

 CPW is correct that a seller may exaggerate the quality or value of goods without becoming liable under a theory of breach of express warranty. *See e.g. Guess v. Lorenz*, 612 S.W.2d 831 (Mo. App.1981). A seller may puff his wares or express his opinion about the quality and value of his goods even to the point of exaggeration without incurring warranty obligation. *Id.* at 833. On the other hand, if the representation is a statement of fact, a petition alleging such a misrepresentation

may sufficiently state a claim for breach of express warranty or fraudulent misrepresentation. *Clark v. Olson*, 726 S.W.2d 718, 719–720 (Mo. banc 1987); *Lowther v. Hays*, 225 S.W.2d 708, 714 (Mo.1950). A given representation can be an expression of opinion or a statement of fact depending upon the circumstances surrounding the representation. *Clark*, 726 S.W.2d at 720.

 We believe that the Carpenters' petition alleged, and their evidence supported, that the representations made by CPW were statements of fact. CPW's salesman referred specifically to this particular car in attesting to its soundness, its reliability. The statements conveyed sufficient definite information about the quality of the LeBaron for that representation to be considered material. *Accord, id.* (seller's representation to prospective home buyer that house was "in good condition" held to be a material statement of fact.)

In *Guess v. Lorenz*, 612 S.W.2d 831 (Mo. App.1981), we held the representation that the car was in good condition was an expression of opinion. *Id.* at 833. In *Guess*, the seller of a used car forthrightly pointed out its defects known to her, although her lack of mechanical knowledge was readily apparent. We concluded considering all the circumstances, it would not be reasonable to find that the seller's remarks about the car's condition were statements of fact and not purely opinion. *Id.*

Unlike *Guess* where buyer and seller were on equal footing, the seller here was an experienced car dealer. CPW enjoyed an additional advantage over the Carpenters because they had purchased an automobile from CPW in the past. Through his prior course of dealing with CPW, Carpenter was thereby rendered "disarmed and made credulous" in relying on the salesman's expertise. *See Shechter v. Brewer*, 344 S.W.2d 784, 788–89[4] (Mo.App.1961). More importantly, CPW (despite its knowledge to the contrary) failed to disclose that this new car had problems with leaks in its steering system and had already been subject to a recall notice for a wiring harness defect. The evidence sufficiently estab-

lished that CPW made a material misrepresentation of a statement of fact to the Carpenters to permit submission to the jury of the Carpenters' claim for breach of express warranty.

▇▇ CPW asserts the same two shortcomings—proof of CPW's making a representation of *fact* and proof that no such representation was *material*—are lacking as elements in the Carpenters' fraud claim. Having analyzed these two elements in our determination whether the Carpenters made a submissible case for breach of express warranty, we need not reiterate our earlier discussion. The same evidence deemed sufficient to establish a material representation of fact to support the Carpenters' claim for breach of express warranty also supports their claim for fraudulent misrepresentation. Satisfied that appellants did make submissible claims against both Chrysler and CPW, we now turn to the merits of the Carpenters' appeal.

Appellants direct their first point against both Chrysler and CPW. They state that the trial court erred in granting both Chrysler and CPW new trials. Appellants argue the trial court failed to view the evidence in the light most favorable to plaintiffs, bearing in mind that most of the grounds in the trial court's order for a new trial involve questions of law and not matters which fall within the discretion of the trial court. Appellants raise a similar issue in their ninth point. They state that the trial court erred in finding the verdict was against the weight of the evidence. Appellants argue that the evidence of Chrysler's wrongdoing required that the trial court find that a verdict for defendant could not stand as a matter of law. Appellants also state that the trial court's judgment was arbitrary because its order of a new trial was not a proper remedy following the trial court's determination that appellants had failed to make a submissible case. Appellants further assert that the trial court's use of its discretion in granting a new trial to Chrysler on the ground the verdict is against the weight of the evidence is highly suspect since the trial court's judgment

also included more than one hundred grounds for granting Chrysler and CPW new trials, none of which has merit, according to appellants.

We first address this last contention raised in appellants' ninth point. The trial court specified in paragraph ten of its order ruling on Chrysler's motion for new trial that "the jury verdicts against Chrysler were against the greater weight of the evidence."

▇▇ Generally, a trial court has discretion to grant one new trial on the ground that the verdict is against the weight of the evidence. Rule 78.02; *Landis v. Sumner Mfg. Co.*, 750 S.W.2d 466, 470 (Mo.App.1988). The trial court's order granting a new trial is presumptively correct, and will be disturbed only in the event of a manifest abuse of discretion. *Landis*, 750 S.W.2d at 470. Where evidence exists to support a verdict in favor of the party receiving the new trial, the trial court does not abuse its discretion in granting it. *Id.* These general principles apply to instances in which the new trial is granted to *plaintiff. Id.* (Emphasis ours.) When the new trial is granted to the *defendant*, the rule operates differently. *Id.* (Emphasis ours.)

▇▇ Where the defendant, rather than the plaintiff, is granted a new trial on the ground that the verdict was against the weight of the evidence, the appellate court is not required to determine whether the evidence was sufficient to support a verdict for defendant because the defendant is not required to present evidence to weigh. *Id.* Missouri has long recognized that the trial court has inherent power to weigh the evidence and to grant a new trial on the ground that the verdict is against the weight of the evidence. *Id.* If a trial court decides to employ the authority granted under Rule 78.02, it may order a new trial reciting that the verdict is against the weight of the evidence and do so with virtual certainty that the ruling is immune from appellate interference. *McDowell v. Kawasaki Motors Corp. U.S.A.*, 799 S.W.2d 854, 859 (Mo.App.1990). As observed in *Lupkey v. Weldon*, 419 S.W.2d 91 (Mo. banc 1967) (Seiler, J., concurring):

We have no way of knowing why the trial court concluded the verdict for plaintiff was against the weight of the evidence. It may have been some matter known to the court in witnessing and presiding over the trial and which does not and cannot appear in the record. His action in awarding defendants one new trial on the ground stated does not have to be supported by substantial evidence in the record on which the jury could have returned a verdict for the defendants.

*Id.* at 94.

■ Because a verdict for Chrysler could stand without any substantial evidence having been adduced in its favor, the trial court was within its discretion to grant Chrysler a new trial on the ground that the verdict was against the weight of the evidence. This determination forestalls any need to address the Carpenters' remaining attacks on the propriety of the trial court's grant of a new trial in favor of respondent Chrysler. *Accord, Gilomen,* 737 S.W.2d at 503.

Our determination of the propriety of the trial court's grant of CPW's motion for new trial requires more extensive discussion. CPW raised sixteen points with thirty-two subpoints in its motion for new trial. CPW, like Chrysler, specifically averred in its motion that the verdict was against the weight of the evidence. The trial court, however, did not include that ground as a basis for its granting of a new trial. The trial court granted CPW's motion on thirteen grounds after finding error in the verdict director's instructions on damages, and the verdict forms; error in the admission of certain expert testimony; error in the admission of certain deposition testimony and error in the award of punitive damages.

■ Our review of the grant of a new trial, as in the instant case, differs from the review of a denial of a new trial. *Farley v. Johnny Londoff Chevrolet, Inc.,* 673 S.W.2d 800, 803[1] (Mo.App.1984). We are more liberal in upholding the grant of a new trial than the denial of a new trial. *Yoon v. Consolidated Freightways, Inc.,*

726 S.W.2d 721, 723 (Mo. banc 1987). When, as here, the trial court grants a new trial, "we must indulge every reasonable inference to the trial court's ruling, and we may not reverse unless there has been a clear abuse of discretion," *Farley,* 673 S.W.2d at 803 (*quoting Penn v. Hartman,* 525 S.W.2d 773, 775 (Mo.App.1975)), "even though we may feel, on the cold record, that as a [trial] court we might have ruled otherwise." *Farley,* 673 S.W.2d at 803 (*quoting DeMaire v. Thompson,* 359 Mo. 457, 222 S.W.2d 93, 97 (1949)). The fact that the trial court's ruling might not have been proper on each and every assigned ground should not render the order ineffectual and deny defendant a new trial. *Farley,* 673 S.W.2d at 806. It is elemental in our jurisprudence that a single ground of error, if prejudicial, is sufficient to warrant granting a new trial. *Id.*

The Carpenters have raised eight points on appeal challenging the trial court's grant of CPW's motion for new trial.

The Carpenters' first point against CPW states that the trial court erred in finding that the Carpenters' verdict directors for breach of warranty and for common law fraud were not supported by substantial competent evidence. We have already analyzed whether the Carpenters made a submissible case on their claims for breach of warranty and common law fraud. We concluded earlier that the Carpenters sufficiently established that the statements of CPW's salesman falsely described the vehicle's condition, that CPW did not disclose to the Carpenters certain repairs made to the car prior to its sale, that the statements were representations of fact and not mere puffing, that the misrepresentations were material, and that the Carpenters reasonably relied upon them. However, our previous discussion did not include any indepth inquiry about damages.

The Carpenters have raised the issue of damages not only in their first point, but also in their second, third, fourth and seventh points against CPW. In addressing the issue of damages for breach of warranty, the trial court specified that Instruction No. 16 on the measure of damages for

breach of warranty was erroneous for five reasons: 1) No substantial competent evidence established the fair market value of the LeBaron when the Carpenters discovered or should have discovered the car did not conform, or of its fair market value as represented by CPW; 2) The instruction erroneously directed the jury to compare the fair market value of the LeBaron at two or more distinct points in time, *i.e.*, the date of the alleged warranties by CPW when the LeBaron was purchased by the Carpenters and at a later date when the Carpenters discovered or should have discovered the LeBaron did not conform to such warranties, resulting in an excessive damage award; 3) No substantial competent evidence supported any consideration or award by the jury of any other damages to "fairly and justly compensate" the Carpenters for the car's failure to conform because such damages were expressly excluded and disclaimed by CPW's contract with the Carpenters; 4) The instruction was vague and ambiguous because it failed to identify the failure to "conform" for which the jury could award damages against CPW, so that the jury might have assessed damages against CPW for alleged nonconformities (such as the incorrect odometer reading) for which Chrysler, and not CPW, was responsible; and, finally, 5) The instruction, considered in tandem with the damage instruction for fraud and multiple verdict forms, permitted the jury to award multiple damages to the Carpenters for an alleged single wrong or injury.

Instruction No. 16 provided as follows:

If you find in favor of the plaintiffs on their claim against Chrysler–Plymouth West for breach of warranty then you must award plaintiffs such sum as you believe was the difference between the fair market value of the vehicle in question when plaintiffs discovered or should have discovered it did not conform and its fair market value had it been as represented by defendant plus such sum as

you believe will fairly and justly compensate plaintiffs for any other damage plaintiffs sustained as a direct result of the vehicle failing to conform.

 The instruction in the legal file fails to reflect any notation from which MAI instruction it is drawn. However, its language is nearly identical to that of MAI 4.17 [1980 New] for damages for breach of warranty under the Uniform Commercial Code. As required under Notes on Use to MAI 4.17 [1980 New], the phrase "fair market value" was defined for the jury using MAI 16.02 [1978 Rev.]. That instruction, No. 17, stated the following:

The phrase 'fair market value' as used in these instructions means the price which the property in question would bring when offered for sale by one willing but not obligated to sell it, and when bought by one willing or desireous [sic] to purchase it but who is not compelled to do so.

In determining fair market value you should take into consideration all the uses to which the property may best be applied or for which it is best adapted, under existing conditions and under conditions to be reasonably expected in the future.[2]

The record refutes the trial court's finding that no substantial competent evidence established the fair market value of the LeBaron when the Carpenters discovered the car did not conform or of its fair market value ("FMV") represented by CPW. Testimony by Diklich of a 20% reduction in the car's value, along with evidence of the numerous repairs, was sufficient to establish the car's FMV when the Carpenters discovered the problems with their car. The $17,000 price was clear evidence of the LeBaron's FMV as represented by CPW. It is reasonable to infer that the price CPW was seeking for the car as represented and which Carpenter was willing to pay for a new car was its value as represented.

**2.** No challenge to the definition of fair market value, Instruction No. 17, was raised by CPW or the trial court. Under the Notes on Use, only the first paragraph of the definition in the pattern instruction of MAI 16.02 [1978 Rev.] should have been used, instead of both the first and second paragraphs. No complaint, however, was made and we discern no prejudice from the inadvertent inclusion of the second paragraph.

*Gollwitzer v. Theodoro*, 675 S.W.2d 109, 111[2] (Mo.App.1984).

■ The trial court's second ground that the instruction erroneously directed the jury to compare the car's FMV at two or more distinct points in time also provides no basis for a new trial. It is precisely this comparison between the car's FMV as represented and its FMV upon discovery of the car's nonconformity that the instruction directs the jury to make. The trial court's finding that the evidence was insufficient to support an award of the other damages to "fairly and justly compensate" the Carpenters for the car's failure to conform because such damages were expressly excluded and disclaimed by CPW's contract with the Carpenters is also without merit.

The retail sales contract contained a clause stating that "[t]his contract contains all of the agreements of the parties relative to the retail installment sale, and no representations, promises, statements or express warranties other than the manufacturer's warranty, have been made by Seller unless contained herein. . . ." This portion of the contract advised the Carpenters that the only warranties for the LeBaron were those contained in Chrysler Motor Corporation's Manufacturers Limited Warranty, which the Carpenters received when they bought the LeBaron. This warranty specifically excluded any consequential damages. CPW states that the trial court properly found instruction No. 16 to be erroneous because the instruction allowed the jury to award incidental and consequential damages which the parties had excluded by the disclaimer of warranty in the sales contract.

Neither side has given us much guidance in resolving this issue. We turn directly to the language Chrysler used in its warranty. The limitation in the manufacturer's warranty specifically provided that the warranty did not cover "incidental or consequential damages such as loss of use of the vehicle, loss of time, inconvenience, expense for gasoline, telephone, travel or lodging, loss of damage to personal property, commercial loss, loss of revenue or other matters not specifically included." This

limitation is a valid limitation or exclusion under Section 400.2–719(3), RSMo 1986, unless it is unconscionable. *Accord Hibbs v. Jeep Corp.*, 666 S.W.2d 792, 796 (Mo.App. 1984). *See also R.W. Murray Co. v. Shatterproof Glass Corp.*, 758 F.2d 266, 271–73 (8th Cir.1985); *Bracey v. Monsanto Co.*, 823 S.W.2d 946, 950 n. 3 (Mo. banc 1992).

We will not belabor this opinion with a detailed examination of unconscionability. We also need not decide whether the limited warranty failed of its essential purpose, thus entitling the Carpenters to recovery of consequential damages (despite the exclusion of such damages under the manufacturer's warranty).

In this case, the dealer's disclaimer in the retail sales contract provided that "[t]his contract contains all of the agreements of the parties relative to the retail installment sale, and no representations, promises, statements or express warranties other than the manufacturer's warranty, have been made by seller unless contained herein. . . ." However, the car was also specifically described as new by the dealer CPW in the same retail sales contract. Section 400.2–313(1)(b), RSMo 1986, provides: "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Since the description of the LeBaron as "new" becomes an express warranty under this section, we consider Section 400.2–316(1), RSMo 1986, as a guide in resolving the conflict between the express warranty and the dealer's disclaimer of such warranty in the same contract. Section 400.2–316(1), provides: "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (section 400.2–202) negation or limitation is inoperative to the extent that such construction is unreasonable."

■ Applying this rule to the facts of the instant case, we hold it is unreasonable to allow an express warranty contained in a

contract (the description as "new") to be negated by the dealer's disclaimer of warranty in the same contract for the two provisions are not consistent with each other. The boilerplate provision of the consumer sales contract should not relieve dealers of their responsibility to deliver a car expressly warranted as "new" to the purchaser in that condition. Thus, while Chrysler, as the car manufacturer, might be entitled to invoke its warranty disclaimer of consequential damages, the dealer CPW is not so entitled to rely. CPW, by its failure to disclose substantial, known repairs that CPW had made to this "new" car to the prospective purchasers (the Carpenters), should not be entitled to escape any other damages which the Carpenters might prove resulted from CPW's nondisclosure. The instruction's inclusion of the phrase "plus such sum as you believe will fairly and justly compensate plaintiffs for any other damage plaintiffs sustained as a direct result of the vehicle failing to conform" did not constitute error to warrant granting CPW a new trial.

■ The trial court's finding that the instruction was vague because it failed to identify the failure to "conform" is also erroneous. MAI 4.17 does not require that a damage instruction for breach of warranty elaborate on what aspect of the product "did not conform." No such modification was necessary. The final ground upon which the trial court granted a new trial based on any error in Instruction No. 16 stated that the instruction, considered in conjunction with the damage instruction for fraud and multiple verdict forms, permitted the jury to award multiple damages to the Carpenters for an alleged single wrong or injury. This ground also lacks merit. We will discuss this in greater detail later, but it suffices for now to say that the Carpenters' eventual election of the jury verdicts prevents any error under this assignment.

In addressing the issue of damages for fraud, the trial court specified that Instruction No. 26 on the measure of damages for fraud was erroneous for several reasons including:

1) There was no substantial evidence that the actual value of the LeBaron on the date CPW sold it to the Carpenters differed from the value represented by CPW to the Carpenters on that date or that any representations concerning the LeBaron's actual value were made by CPW;

2) There was no substantial evidence that the Carpenters were damaged as a result of any alleged representations by CPW because any actual damages were caused by the Carpenters' allowing the car to be repossessed and sold as a repossessed car;

3) There was no substantial evidence that the subsequent purchaser on resale of the LeBaron knew or had notice of the car's prior service history;

4) The instruction, considered along with the other damage instructions and multiple verdict forms, permitted the jury to award multiple damages to the Carpenters for a single wrong or injury.

Instruction No. 26 stated as follows:

If you find in favor of plaintiffs on their claim against Chrysler–Plymouth West for fraud then you must award plaintiffs such sum as you believe was the difference between the actual value of the vehicle in question on the date it was sold to plaintiffs and what its value would have been on that date had the vehicle been as represented by defendant Chrysler–Plymouth West.

Again, the instruction in the legal file does not show from which MAI it is taken. A review of MAI–4th ed. reflects the instruction is patterned after MAI 4.03 [1969 New] for damages to property for misrepresentation.

■ The court found this instruction to be erroneous because there was no substantial evidence that the actual value of the LeBaron when CPW sold it to the Carpenters differed from the value represented on that date by CPW to the Carpenters. The value of the LeBaron as represented on the date of the sale by CPW to the Carpenters of the new car was its sale price of approximately $17,000. According to the testimony of Richard Diklich, the

Carpenters' expert witness, the car's actual value was reduced by some twenty percent based, in part, on its repair history. Furthermore, evidence at trial established that within one month of the Carpenters having taken possession of the car, costs of repair to the car had reached $1,061.95. This same evidence of extensive repairs to a "new" car contradicts the trial court's finding that any actual damages suffered by the Carpenters were caused by the Carpenters allowing the LeBaron to be repossessed and sold as a repossessed car. Whether the subsequent purchaser on resale of the LeBaron knew or had notice of the car's prior service history does not diminish that the car's condition when sold to the Carpenters was not as CPW had represented. The measure of damages in a fraud case is the "benefit of the bargain rule" which allows the defrauded party to recover the difference between the property's actual value and what its value would have been if it had been as represented. *Delong v. Hilltop Lincoln–Mercury, Inc.*, 812 S.W.2d 834, 841 (Mo.App.1991). Finally, the trial court's final finding on why the instruction for the measure of damages for fraud was erroneous parrots its last finding concerning the measure of damages for breach of warranty. As we mentioned with respect to that point, our subsequent discussion about the Carpenters' eventual election of the jury verdicts precludes any necessity for retrial under this assignment of error. Thus, we discern no basis to support the trial court's decision to grant CPW's motion for new trial on any grounds of alleged error in the instruction for damages for fraud.

The trial court also determined the submission of punitive damages under Instruction No. 27 to be inappropriate because no substantial competent evidence supported the submission of a claim for punitive damages or established that CPW's conduct was outrageous with evil motive or reckless indifference to the rights of others or that punitive damages were necessary to punish CPW or deter it and others from like conduct. The trial court also held that the award of punitive damages was constitutionally infirm as violative of due process because the standards for imposition of such damages were unconstitutionally vague; no realistic standards or limits on the amount which may be awarded existed; and no relationship between the award of actual and punitive damages was required. The trial court further held that the punitive damages award was excessive, bore no reasonable relationship to the Carpenters' actual damages, and was the result of undue sympathy, bias, passion and prejudice.

 The trial court had ruled the Carpenters failed to make a submissible case for punitive damages because there was no substantial evidence that CPW's conduct was outrageous. In reviewing the submissibility of the issue of punitive damages, we review the evidence in the light most favorable to submissibility. *Walker v. Gateway Nat. Bank*, 799 S.W.2d 614, 617 (Mo.App.1990). Punitive damages are appropriate only where the conduct of defendant is outrageous because of defendant's evil motive or reckless indifference to the rights of others. *Id.* That is the test approved by our Missouri Supreme Court under *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo. banc 1989).

 The Carpenters highlight their evidence which they claim supports the jury's award of punitive damages in their favor and against CPW. As discussed earlier CPW made a number of substantial repairs to the LeBaron before the Carpenters took possession and withheld information concerning these repairs from the Carpenters. From this evidence alone we are satisfied that the jury could reasonably infer that CPW's actions were taken with reckless indifference to the rights of the Carpenters or were evil, motivated solely by CPW's desire to make a sale regardless of the repairs CPW had undertaken but had not disclosed to the Carpenters. CPW's conduct supported consideration of punitive damages because of its intentional representation to get the Carpenters to pay a price above what a repaired vehicle would have brought. *Accord, Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 665 (Mo.App.1991). The trial court erred in concluding that CPW's conduct was not outrageous be-

cause the evidence viewed in the light most favorable to the Carpenters supported the jury's finding to the contrary.

■ The Carpenters also dispute the trial court's findings that the award of punitive damages violated the due process clause of the United States Constitution because the standards for permitting such an award were vague, there were no limits on the amount of the award, and there was no relationship required between the amount of actual damages sustained and the amount of punitive damages awarded. The standard for the imposition of punitive damages requires the jury find that defendant's conduct was outrageous because of defendant's evil motive or reckless indifference to the rights of others. MAI 10.01. The Supreme Court in *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, ——, 111 S.Ct. 1032, 1044, 113 L.Ed.2d 1 (1991), recognized that a similarly-worded Alabama instruction did in fact give the jury significant discretion in its determination of punitive damages. But, the Supreme Court added that such discretion was not unlimited because "[i]t was confined to deterrence and retribution, the state policy concerns sought to be advanced." 499 U.S. at ——, 111 S.Ct. at 1044. The Court observed that the instruction required the jury, in awarding punitive damages, to "take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong." *Id.* The instruction thus enlightened the jury about the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory. *Id.*

We believe the same can be said of the language embraced in Missouri's punitive damage instruction. In *Burnett v. Griffith*, 769 S.W.2d 780 (Mo. banc 1989), our supreme court set forth the form and content of MAI 10.01, the instruction given here, as the proper instruction on punitive damages capable of being readily understood by jurors. *Id.* at 789. As expressed in *Burnett*, this instruction requires that there be some element of outrage to justify punitive damages, that conduct is "outrageous" because of "evil motive or reckless indifference" and that the purpose of punitive damages is to punish and deter. *Id.* Our supreme court has fashioned an instruction which provides a sufficient standard to guide jurors in their determination of what conduct supports an award of punitive damages. Accordingly, we reject the trial court's finding that the standards for imposition of punitive damages were unconstitutionally vague.

■ We also reject the trial court's finding that the punitive damage instruction lacked limits on the amount of the award, or failed to require a relationship between actual damages sustained and the amount of the punitive damages award. It is true that in Missouri a jury has great discretion in fixing the amount of punitive damages, and that determination is not to be disturbed unless it is the product of bias or prejudice or is otherwise an abuse of discretion. *Beggs v. Universal C.I.T. Corp.*, 409 S.W.2d 719, 724 (Mo.1966). There are many factors a jury may consider in Missouri when assessing punitive damages: (1) degree of malice, positive wrongdoing or criminality characterizing the act; (2) regarding the injured party— a) age, sex and health; b) character; c) injury suffered; d) financial worth; (3) regarding the defendant—a) intelligence, standing or affluence; b) financial worth; c) character; and 4) all circumstances surrounding the [bad act], including mitigating and aggravating circumstances. *Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 662 n. 2 (Mo.App.1991). In addition, Missouri courts require a reasonable relationship between the amount of punitive damages awarded and the injury inflicted and the cause thereof. *Van Eaton v. Thon*, 764 S.W.2d 674, 677 (Mo.App.1988). The Missouri Supreme Court presumably was fully aware of the case law which has developed numerous restrictions on the amount of punitive damages a jury may award but the court elected, wisely we believe, not to incorporate these sundry limitations within the express provisions of the instruction.

Because there are so many different factors to consider, no formula could possibly judge the propriety of every punitive damage award. *Maugh*, 818 S.W.2d at 662 n. 2. Each case must be decided on its own facts. *Id.*

In *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the United States Supreme Court stated that "as long as the [punitive damage fact finder's] discretion is exercised within reasonable constraints, due process is satisfied." 499 U.S. at ——, 111 S.Ct. at 1044. In evaluating the procedure for awarding punitive damages in Alabama, the Supreme Court noted two constraints controlled jury discretion. First, the trial court properly explained the deterrent and punishment purposes of punitive damages. *Id.* Second, both the trial court and the appellate court applied independent substantive criteria of review required by Alabama, (even including consideration of evidence that was not before the jury) to guarantee the award was reasonable in amount and rational in light of the purposes of punitive damages to punish and deter. *Id.* 499 U.S. at ——–——, 111 S.Ct. at 1044–45. The Supreme Court held that this post-trial review of punitive damage awards, in conjunction with a proper instruction to the jury, provided an adequate constraint on jury discretion to satisfy due process. *Id.* 499 U.S. at ——, 111 S.Ct. at 1046.

We believe the trial and post-trial review of punitive damages followed in Missouri comports with the Alabama system approved by the United States Supreme Court in *Haslip*. This court will only disturb the jury's verdict when "it plainly appears that the jury has abused its discretion", *see e.g. Wisner v. S.S. Kresge Co.*, 465 S.W.2d 666, 670 (Mo.App.1971), or that a court may reduce or reverse punitive damages in Missouri only if the award is the product of bias or prejudice. *Beggs*, 409 S.W.2d at 724. However, as we stated earlier herein, there are many different factors left tacitly to the jury's assessment, *see Maugh*, 818 S.W.2d at 662 n. 2, which the trial or appellate court also must consider when reviewing the propriety of the jury's punitive damages award. While Missouri eschews any precise mathematical formula, its system of review is "meaningful and adequate" within *Haslip*. We are comfortable in holding that review by either the trial or appellate court assures that general concerns of reasonableness are properly entered into the constitutional calculus.

That these standards have real effect cannot be doubted. For examples of their application in trial practice, *see Perkins v. Sur–Gro Finance, Inc.*, 778 S.W.2d 751 (Mo.App.1989), and *Signorino v. National Super Markets, Inc.*, 782 S.W.2d 100 (Mo. App.1989). Likewise, post-verdict review by appellate courts has resulted in reduction or reversal of punitive damage awards. *See e.g. Knopke v. Knopke*, 837 S.W.2d 907, 918 (Mo.App.1992). Therefore, we conclude that, while the jury instruction does not expressly limit the punitive damage award, the review by the trial or appellate courts based on the many factors enumerated in *Maugh*, provides a reasonable constraint on the amount of the punitive damage award.

■ Finally, there is no merit to granting CPW a new trial on the ground that there was no relationship between the actual damages and punitive damage award. The purpose of punitive damages is to punish and deter, not to compensate. *Litchfield v. May Dept. Stores Co.*, 845 S.W.2d 596, 598 (Mo.App.1992). Thus, the amount of punitive damages need not bear any particular relation to the amount of compensatory damages. *Id.* Regardless, the jury here awarded the Carpenters $3,400 actual damages and $17,000 punitive damages on the Carpenters' fraud claim. The purchase price of the LeBaron automobile was $16,999.50. One can readily infer that the jury found this amount was reasonably related to the injury suffered by the Carpenters caused by CPW's fraudulent behavior in the sale of a new car. We find such amount justified and in no way excessive. *Accord, Delong v. Hilltop Lincoln–Mercury, Inc.*, 812 S.W.2d 834 (Mo. App.1991) ($75,000 punitive damage award held not excessive where only $3,000 actual damages awarded). Nothing in the record suggests that the punitive damages award-

ed were the product of bias or prejudice. We conclude the trial court abused its discretion in granting CPW a new trial on any ground related to punitive damages.

■ The Carpenters have also raised an issue concerning the admission of evidence. The Carpenters assert that the trial court erred in finding that portions of the depositions of two of their witnesses Ronald Ulstruck and Morris Munson were improperly admitted on the grounds that the notice of these depositions failed to comply with the Missouri Rules of Civil Procedure, that CPW did not receive notice of these depositions and that CPW was not invited to participate in the depositions of these two witnesses.

The Carpenters readily concede that CPW was not given notice of these depositions. The depositions in question were originally taken for use in a different case, thus explaining why CPW had no opportunity to examine the deposition witnesses. The depositions in this trial were admitted solely for the limited purpose of explaining Chrysler's Overnight Evaluation Program. Furthermore, the trial court specifically instructed the jury that such evidence was to be used solely against Chrysler. We discern no possible prejudice to CPW resulted from the admission of these deposition excerpts. Such error, if any, did not warrant the trial court's grant of a new trial on this ground in favor of CPW.

The trial court also granted CPW's motion for new trial on the ground that the receipt of testimony from the Carpenters' expert witness Richard Diklich concerning the value of vehicles was erroneous because there was no foundation that Diklich was competent to testify or to offer an expert opinion concerning the value of new vehicles at the time of their first retail sale. Chrysler had raised this same claim in its motion for new trial which the trial court had also granted. The Carpenters argue that the jury should have been free to weigh Diklich's valuation evidence against any such evidence presented by CPW.

■ The trial transcript reflects that the Carpenters established that Diklich was a college professor of automotive service, with strong credentials bespeaking his expertise in the automotive industry. As an adjunct to providing specialized training to technicians for various car manufacturers including Ford, General Motors and Toyota, he assisted dealerships in setting up service departments. He also performed mechanical inspections for warranty companies; served on arbitration boards, both as a member and independent evaluator; officiated at a national contest for automotive diagnostic and repair; and possessed a wholesale dealer's license for buying and selling cars for a period of years. His qualifications were unchallenged at trial. We find no basis in the record to support the trial court's ruling that Diklich was not competent to testify or offer an expert opinion concerning the value of new cars. This ground provided no basis for the trial court to grant CPW a new trial.

The Carpenters contest the trial court's determination that Instruction No. 14, the Carpenters' verdict director for breach of warranty, was prejudicially vague, ambiguous and erroneous as a matter of law because it did not require the jury to find that the alleged representations or warranties were false when made or that the vehicle did not conform to the representations or warranties when they were made. The Carpenters claim the grant of a new trial on this ground was erroneous because their verdict director as given complied with the applicable MAI instruction; therefore, the trial court had no authority to declare the instruction improper. CPW does not directly respond to this issue in its brief.

■ In deciding this issue, we do not review the trial court's ruling under the standard that the granting of a new trial is discretionary with the trial court. This ruling is one of law, and this court reviews it unhindered by any presumption in favor of correctness. *Accord, McTeer v. Clarkson Constr. Co.*, 807 S.W.2d 174, 176 (Mo.App. 1991). Rule 70.02(b) requires that "[w]henever Missouri Approved Instructions contains an instruction applicable in a particular case which the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other on the same subject."

■ Here, Instruction No. 14 required the jury find CPW sold and the Carpenters purchased the vehicle in question; second, that CPW represented the car was reliable and in good, safe and roadworthy condition; third, that such representation was made to induce the Carpenters to purchase or was a material factor in their decision to purchase; fourth, the car did not conform to such representations made by CPW; fifth, within a reasonable time after the Carpenters knew or should have known of such failure to conform, the Carpenters gave CPW notice thereof; and sixth, as a direct result of such failure to conform, the Carpenters were damaged.

The Carpenters' verdict director tracked the language of MAI 25.07 [1991 Rev.] without modification. CPW does not dispute that MAI 25.07 [1991 Rev.] is the appropriate MAI. The trial court granted CPW a new trial on the ground that the verdict director failed to instruct the jury that it find that the alleged representations or warranties were false when made. MAI 25.07 [1991 Rev.] upon which Instruction No. 14 was patterned does not contain such a requirement. The trial court clearly erred in granting a new trial on this ground.

The second prong of the trial court's ruling that the instruction failed to require the jury to find that the vehicle in question did not conform to the representations or warranties when they were made is also erroneous. The fourth element of the instruction given clearly stated that the jury must believe that the vehicle did not conform to the representations made by CPW. The instruction was neither erroneous nor prejudicial. We conclude this ground provided no basis for the trial court to grant CPW's motion for new trial.

The Carpenters state that the trial court also erred in granting CPW's motion for new trial on the ground that Instructions No. 16 (measure of damages for breach of warranty) and No. 26 (common law fraud measure of damages) and the multiple verdict forms permitted the jury to assess multiple damages for an alleged single wrong or injury. Chrysler had raised a similar issue in its motion for new trial which the trial court also granted. CPW does not squarely address the issue whether the Carpenters' election of damages after submission to the jury was appropriate.

■ The Carpenters assert that election of damages is designed to prevent double recovery for a single event. They argue that purpose is served whether election happens before or after the jury renders its verdict. Here, the jury found against CPW on both the claims of breach of warranty and common law fraud and returned verdicts against CPW on each claim. The Carpenters filed an election of remedies following the jury verdicts, electing only to recover only under the common law fraud count, and not the breach of warranty. *Freeman v. Myers,* 774 S.W.2d 892 (Mo. App.1989), is dispositive of this point. In *Freeman,* plaintiff submitted her case by separate instructions on two theories, common law fraud and violation of federal odometer statutes. *Id.* at 895. A separate verdict was submitted and returned on each theory and plaintiff elected to take recovery under the common law fraud verdict. Here, as in *Freeman,* when the Carpenters waived their verdict for breach of warranty and elected to recover damages on only the fraud count, CPW was protected against duplicitous recovery. *Accord, Freeman,* 774 S.W.2d at 895. This was all the relief to which CPW was entitled. Like *Freeman,* this situation does not involve an election of inconsistent remedies. *Accord, Orrock v. Crouse Realtors, Inc.,* 823 S.W.2d 40, 41 (Mo.App.1991). The trial court erred in granting CPW a new trial on this ground.

The judgment of the trial court granting Chrysler a new trial is affirmed. The judgment of the trial court granting CPW a new trial is reversed and remanded with directions that the jury verdict in favor of the Carpenters be reinstated.

PUDLOWSKI, P.J., and CRIST, J., concur.