Bob MOORE, et al., Appellant–Respondent,

v.

**MISSOURI–NEBRASKA EXPRESS, INC., Respondent–Appellant.**

**WD 47753.**

Missouri Court of Appeals, Western District.

Dec. 13, 1994.

R. Dan Boulware, St. Joseph, for appellant-respondent.

Stephen James Briggs, St. Joseph, for respondent-appellant.

Before ULRICH, P.J., and LOWENSTEIN and HANNA, JJ.

LOWENSTEIN, Judge.

This case involves a long trial, the sustaining of a petition for a writ of prohibition [1] and this appeal, all stemming from a business relationship that went sour. A jury brought

---

1. *State ex rel. Missouri–Nebraska Express v. Jackson,* 876 S.W.2d 730 (Mo.App.1994) dealt with post-trial discovery on the issue of net worth following an order of remittitur on the punitive

damage verdict. Discussion of the part of this appeal dealing with remittitur is located in III, *infra.*

back verdicts on the plaintiffs' breach of contract and fraud claims, plus a substantial punitive award which was remitted in amount. Both sides have appealed. An overview of the facts is first in order. Four persons, Moore, Buttoroff, Nicholas and Bowlin (Owners), owned large over-the-road truck units. These four persons will be referred to as the Owners. Starting in 1979, the Owners, using all the same terms and format, leased a combined total of twenty-nine of their trucks to a trucking company, the defendant, Missouri–Nebraska Express, Inc. (Truck Lines). By 1983, all 197 trucks utilized by Truck Lines were leased. It should be noted there were up to forty individuals or entities which leased trucks to Truck Lines, but only four of them are plaintiffs in this suit.

The leases provided the Owners would be paid by the mile for any truck usage by Truck Lines. Owners were to supply the drivers and pay fuel costs. The compensation rate per mile to Owners was geared to fluctuating changes in fuel costs, so the rate of return to Owners was not to be affected by fuel price increases or decreases. Several years into this business relationship, in approximately December, 1985, Truck Lines worked out an arrangement with a particular fuel company, Union 76, that if all of Truck Lines' fuel business were given to some fifty-five Union 76 stations nationwide, the drivers would be supplied credit cards and, in return for giving the gas stations all its business, Truck Lines, or in this case, Owners, would get a cash price instead of a higher credit price (often a five cent spread).

Truck Lines went to the individual Owners who were responsible for the fuel costs and obtained Owners' approval of the deal with Union 76. One of the fact issues before the jury was the allegation that Owners had no choice but to approve the agreement; for if they did not, they were afraid Truck Lines would cancel their leases. Unknown to Owners, Truck Lines received a cash "rebate" or, "volume discount," directly from Union 76, or from the individual stations. This rebate was for all purchases for Truck Lines' business (whether leased or owned vehicles) and sometimes amounted to more per gallon than

the credit-cash differential. There was a variance in the evidence whether the Owners knew or should have known of this cash payment to Truck Lines based on fuel usage, which payments went to Truck Lines until the leases were eventually terminated on October 1, 1988, by Truck Lines. These rebates formed one count for which total actual damages of $121,159 were claimed by the plaintiff-Owners. This count was submitted on the alternate theories of breach of contract, fraud and fraudulent non-disclosure, and while the jury returned verdicts for $121,159 on the three verdict forms, the judge entered but one judgment. This conduct of the defendants also formed the basis for punitive damages.

The jury awarded the four Owners a total of $4.2 million in punitive damages. The trial court sustained a remittitur on the punitive award and entered a total punitive judgment of $350,000. That action forms the basis of Owners' appeal which will be dealt with in Part III (remittitur) of this opinion.

The other submission was on a claim that Truck Lines had misled Owners about changing the effect of termination of the leases, causing them $59,920 in damages. The theory was Truck Lines promised to amend the leases, breached that promise, and the Owners relied on that promise to their detriment. Evidence favorable to the plaintiffs' verdict on this count was to the effect Truck Lines had proposed an amendment to the basic lease which called for a 365 day notice to be given by Truck Lines. However, if they canceled with less notice, Truck Lines would pay Owners $10 a day for each day less than 365 for which notice was given. There had been a concern among Owners regarding the growth of Truck Lines' company owned fleet, and their leases would suddenly be terminated. Evidence favorable to the verdict showed Truck Lines had for several years planned to terminate the truck leases and replace the vehicles with its own. While Truck Lines was reducing the number of vehicles leased from Owners to zero, and meanwhile building up its own company fleet, it was promising Owners to renegotiate the lease termination clauses, which it never did,

then terminated on terms unfavorable to Owners.

### CHRONOLOGY

| 1979–1983 | 1984 | 1985 | 1986 | 1988 | 1989 | 1991 |
|---|---|---|---|---|---|---|
| Owners start leasing total of 29 trucks to Truck Lines. | Lines begins program to own fleet. (See Below) | Lines promotes change to 76 fuel purchases | Fuel program and rebates begin. | October—Lines notice to terminate. | March— Termination effective. Fraud on rebates discovered June—Owners suit on wrongful termination filed. | September—Fraud on rebates count added by Owners. |

| 12/31/83 | | 12/31/94 | | 12/28/85 | | 1/3/87 | | 12/31/88 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Leased | 197 | Leased | 227 | Leased | 280 | Leased | 73 | Leased | 46 | Leased | 1 |
| Owned | 0 | Owned | 60 | Owned | 131 | Owned | 515 | Owned | 675 | Owned | 756 |

Since both sides have appealed, under Rule 84.04(j), Owners, as plaintiffs, are deemed the appellants here. Nevertheless, for purposes of presenting this rather involved appeal, the defendant Truck Lines' points on appeal will be taken up first and are located in parts I (Wrongful Termination) and II (Rebates) of this opinion. Part III is Owners' appeal on remittitur.

### TRUCK LINES' APPEAL

Truck Lines has raised eleven points in its appeal. Only Truck Lines' final point deals with the wrongful termination count. Again, for ease in presentation, this point will be taken up first along with pertinent facts. Additional facts relating to the multitude of points dealing with Truck Lines' fraud with regard to the rebates, will be set out in the discussion of those remaining points in part II.

### I. WRONGFUL TERMINATION
#### (Promissory Estoppel)

In early 1987, Owners were getting nervous about the fact Truck Lines' fleet was growing so large, and Owners felt Truck Lines was going to cancel their leases. The leases contained a cancellation provision calling for a 30 day notice before cancellation. Truck Lines was afraid Owners, feeling insecure about the continuation of the leases, would first terminate and seek to lease elsewhere. This would have left Truck Lines without sufficient trucks for a period of time.

So, the evidence showed Truck Lines, at a meeting in January 1987, and in order to make the Owners feel comfortable, presented a lease amendment to Owners which increased the notice required by Truck Lines from 30 to 365 days and added a penalty of $10 a day per truck for each day less than the full 365 days notice. Owners' notice requirement was to be increased to 120 days with a maximum penalty of $2,000 for early cancellation. Then, at a meeting in March of the same year, Owners requested amendment language which would waive any penalty for them in case of their bankruptcy. Additionally, the evidence showed they insisted, and Truck Lines agreed to all these changes. Finally, it was agreed that Truck Lines agreed to all these changes, and that Truck Lines was supposed to draft the amendments and send these amendments to the individual Owners to be signed. Two of the plaintiff Owners were not present at the meeting. Two testified they never received the amendments. Two received amendments but not the agreed upon language as to a bankruptcy provision. None of the four signed.

Needless to say, the evidence, some of which came from the testimony of a Truck Lines' official, was that these amendments which were favorable to Owners, were never going to become part of the lease. The only purpose Truck Lines had floating them to the Owners was to lull Owners into a false sense of security, and buy time in which to

allow Truck Lines to secretly acquire its own fleet and then terminate under the never-amended lease by giving only thirty days notice. The undisputed evidence showed Truck Lines set up a program in 1984 to completely own, rather than lease its fleet. The reader may want to refer back to the chronology of events and, particularly, the shift in Truck Lines' fleet from leased to owned vehicles starting in 1984.

■ The amendments were not forthcoming from Truck Lines, and never signed. Not surprisingly, the underlying lease contained language that any amendment had to be in writing. Then, after several months, while promising to draw up and deliver the amendments to Owners, Truck Lines canceled the leases and suit was filed by Owners for wrongful termination. Owners' theory of recovery was based on promissory estoppel which embodies the following elements: 1) promise; 2) detrimental reliance on the promise; 3) promisor could reasonably foresee the precise action the promisee took in reliance; and 4) injustice can only be avoided by enforcement of the promise. *Geisinger v. A & B Farms, Inc.*, 820 S.W.2d 96, 98 (Mo. App.1991).

In the case at bar, the verdict director, paraphrased, required a plaintiffs' verdict if the jury believed: 1) a promise made by the Truck Lines to make certain written amendments to the lease, including no penalty for the Owners if they had to prematurely terminate because of their bankruptcy; 2) a promise to submit the amendments to Owners; 3) Truck Lines reasonably expected its promises would cause Owners "to await receipt of the written amendment . . . ;" 4) using ordinary care, Owners did rely on the promise; 5) Truck Lines never sent the amendment; 6) therefore, it was not signed because of Truck Lines' failure to provide the written amendment; such failure resulted in damage and the result would be unjust if the promise were not enforced. *A.L. Huber & Son, Inc./Clevenger Homes, Inc. v. Jim Robertson Plumbing, Inc.*, 760 S.W.2d 496, 498 (Mo. App.1988).

The judgment entered on the verdict was for the amount of termination fees contemplated under the proposed amendments that had never been formally adopted. No question is raised as to the amount of the penalty as calculated in the prayer ($10 per day times the number of days the notice was under 365 days), but Truck Lines decries the use of a promissory estoppel theory to remedy the failure to formally adopt a lease amendment by these Owners and Truck Lines.

### A.

Truck Lines first contends several elements of promissory estoppel were not supported sufficiently to justify submission of this count. Truck Lines refers this court to its previously cited opinion in *Geisinger v. A & B Farms Inc.*, 820 S.W.2d, at 98, to the effect that the doctrine of promissory estoppel is to be "used with caution, sparingly and only in extreme cases to avoid unjust results." *Id.*

■ Truck Lines contends the first element, promise, was not supported because it made no promise at the March meeting. This contention is not well founded. Evidence favorable to the submission, *McCarthy v. Wulff,* 452 S.W.2d 164, 166 (Mo.1970), was Truck Lines' promise to include a bankruptcy provision in the amendment it was to prepare and then distribute for signature by Owners. In *Coffman Industries, Inc. v. Gorman–Taber Co.,* 521 S.W.2d 763, 768 (Mo. App.1975), the court equated an offer to make a contract with a promise, and defined "promise" as "an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such a manner to a promisee that he may justly expect performance, and may reasonably rely thereon," quoting from **1 Corbin on Contracts, Sec. 13.**

■ Truck Lines then states there was no detrimental reliance since none of the Owners "ever asked about the revised lease amendment after the March 14, 1987 meeting," but continued to lease their trucks without themselves terminating on 30 days notice. This argument misses the mark, in light of substantial evidence Owners were waiting for the amendments. Owners testi-

fied they were being constantly advised by Truck Lines that the amendments were in the process of being prepared and delivered. They testified they were at all times ready to sign the amendments which never arrived.

■ Also without merit is the assertion Truck Lines could not have reasonably foreseen the reliance by Owners. The jury had sufficient evidence, and could make reasonable inferences flowing from the evidence that Truck Lines did, in fact, want Owners to believe the amendments were going to be effectuated. The evidence was also supportive of Truck Lines' intent to drag the matter out until it could build up its fleet, and then cancel on terms favorable to Truck Lines.

■ Truck Lines next contends no injustice would be worked even if the other elements of promissory estoppel were proven. Truck Lines carefully planned to terminate on short notice only after it had built up its fleet. During the time following the January 1987 meeting, it reassured Owners there would be no termination. The court holds that under the facts here, particularly the uncontradicted evidence of Truck Lines' plan to allay the Owners' fears while stalling for time, if allowed to stand, would be unjust.

### B.

■ Truck Lines contends federal regulations call for truck leases to be in writing. This amendment was not in writing, and to employ the doctrine of promissory estoppel, would be contrary to Missouri case law which does not allow its use when the matter is covered by the statute of frauds. Section 432.010, RSMo 1986. It relies on *Longmier v. Kaufman*, 663 S.W.2d 385, 388–90 (Mo. App.1983). *Longmier* involved a lease of real estate which was not in writing and the doctrine of promissory estoppel was proposed to try and get around the effect of § 441.060.2, RSMo 1978. The Owners counter, and Truck Lines does not disagree, that federal law and the Interstate Commerce Commission's requirement that leases be in writing is for the purpose of protecting the public, not to protect the actual parties making the contract. As such, the lease contents would not be an issue under the Missouri Statute of Frauds in an action between a lessor and lessee. In any event, as *Geisinger v. A & B Farms*, 820 S.W.2d at 98–99 points out, in a few cases, the clash between the Statute of Frauds and promissory estoppel will be resolved in favor of use of the *doctrine* instead of Statute of Frauds in "extraordinary cases." Because this is an extraordinary case, promissory estoppel is used and the point is denied.

### C.

■ The final argument under this point, presented in less than a page, is the novel contention that since two of the plaintiffs were not present at the March meeting, there should have been presented at trial an instruction as to agency. The theory is that the two Owners present would have to have been proven as agents for the two not present at the meeting. This argument seems to say that the two present could not have relayed the pending amendment information to the non-present Owners unless an agency relationship was established. This argument is rejected out of hand. The evidence was clear ... Truck Lines was promising to amend the leases for all lessor-Owners.

Truck Lines' remaining points will now be addressed. All of these points relate to the submission for actual and punitive damages for fraud arising out of the fuel rebates returned by Truck Lines.

### II. REBATES

Under this heading the court will take up all of Truck Lines' remaining points dealing with submission of damages. This count on the petition was submitted on three separate grounds: 1) fraudulent misrepresentation; 2) fraudulent non-disclosure; and 3) breach of contract. The actual and punitive damage verdicts were equal, and the court entered but one judgment not delineating the count it was rendered on. For the purposes of this opinion, the court will treat the judgments as being rendered on fraudulent misrepresentation. This is because if any one of the submitted theories was proper, then the judgment will stand and this court will examine only the fraudulent misrepresentation count. Therefore, Truck Lines' points which do not

deal with fraudulent misrepresentation will not be discussed.

## A. NO OWNERS' RIGHTS TO OR DAMAGE FROM REBATES

■ This point is best presented in the following portion from Truck Lines' brief:

"The three principal claims in this lawsuit—plaintiffs' (Owners) fraud, fraudulent non-disclosure, and breach of contract claims—are all based on plaintiffs' assumption that they were somehow entitled to share in the volume discounts that Missouri–Nebraska–Express was able to negotiate on the Union 76 fuel purchases. Because plaintiffs cannot show that they sustained any damage by virtue of these rebates, however, or that they had any legal entitlement to them, plaintiffs failed to make a submissible case on any of their principal claims. * * * Plaintiffs received exactly what they bargained for: a cash pump price even though they were using [Truck Lines'] credit."

Truck Lines' theory was that Owners got what they were told they would get ... a four to five cent per gallon savings; therefore, they were not entitled to the volume discount which had been separately negotiated by Truck Lines.

This point can best be examined by first looking at the verdict director for fraudulent misrepresentation:

Your verdict must be for Plaintiff Harold K. Bottorff, Inc., if you believe:

First, Defendant represented that the cost of the fuel to Plaintiff and Defendant was the cash pump price, intending that Plaintiff rely upon such representation in participating in the Union 76 fuel program; and

Second, the representation was false, and

Third, Defendant knew that it was false at the time the representation was made; and

Fourth, the representation was material to the participation by Plaintiff in the Union 76 fuel program; and

Fifth, Plaintiff relied on the representation in participating in the Union 76 fuel program, and in so relying, Plaintiff was using ordinary care; and

Sixth, as a direct result of such representation Plaintiff was damaged, ...

Evidence favorable to the verdict showed no disclosure to Owners of the volume discounts prior to the discovery by them, of the arrangement between Union 76 and Truck Lines, sometime in late 1988 or early 1989. The evidence was that at the time Truck Lines made the presentation to Owners in December 1985, Owners expressed concern that Union 76 charged more for fuel, but Owners were never told of a volume discount, and they were assured the price of the fuel they paid was the price on the invoice. As stated earlier, the jury returned a verdict equal to Owners' evidence as to the rebates paid by Union 76 to the defendant Truck Lines. Owners readily admit the program, as represented to them, had some value since they were responsible for fuel costs, and the fuel was obtained in a credit transaction for a cash price. Their answer is that Truck Lines represented to Owners the cash price was Truck Lines' and Owners' actual cost of the fuel, when the actual cost was the cash price (paid by Owners) less the undisclosed cash rebate paid directly by Union 76 to Truck Lines. In December 1985, Owners were using what was called a Gold Card System for purchasing fuel, which allowed purchases at almost any gas station for a similar or lower price than what was presented by Truck Lines under the Union 76 plan. The Gold Card System was in conjunction with Truck Lines. Under the Gold Card arrangement, there was no differential and no rebates. In addition, the Union 76 plan called for purchases at only a few stations nationwide. Truck Lines told Owners that their driver morale would be improved under the 76 plan, since those stations offered better conditions and more services. Based on these representations, Owners changed from the Gold Card System to the 76 program, and never learned about the rebates until after the parties' agreement had been terminated and this lawsuit commenced.

Owners' evidence pinpointed the amount of the rebates paid to Truck Lines. The jury brought back damages in this fraud action in an amount equal to the plaintiffs' evidence. "The measure of damages in a fraud case is

the 'benefit of the bargain rule' which allows the defrauded party to recover the difference between the property's actual value and what its value would have been if it had been as represented." *Carpenter v. Chrysler Corp.,* 853 S.W.2d 346 (Mo.App.1993). Such is the case here. Here the jury award of damages clearly represents the loss of bargain and, therefore, is consistent with *Carpenter.* The point is denied.

## B. INCORRECT DAMAGES

■ In this point, Truck Lines asserts the total actual damage award of $128,160.22 on the fuel rebate submission was incorrect since the contract between the parties itself took fluctuations in fuel prices out of the rate of compensation. It argues the contract was practically cost neutral in that for every five cents the cost of fuel went down, a penny would be taken off the rate Truck Lines had to pay Owners as compensation. It continues, that had the actual rebates been passed through to Owners for the three and one-fourth year period the 76 program was in effect, the amount of their lease payments to Owners would have been reduced, thus reducing damages according to Truck Lines' evidence to a maximum of $17,118. In sum, Truck Lines states the judgment entered on the verdict was excessive and not within the range of evidence.

Some additional information as to the facts relating to this complicated and extended business arrangement between the parties is now in order. Suffice it to say, that despite lease and supporting documents outlining the lease of large numbers of expensive over-the-road trucks, the evidence as to the effect of fuel costs on the ultimate amount paid by the lessees under the lease was murky and was hotly contested before the trier of fact. Despite the substantial value of trucks, equipment and lease payments involved, the impact of fuel costs was never clearly spelled out, and to the credit of the jury and the trial judge in reaching an ultimate determination, it was complicated to say the least.

A provision of the lease contained language that fuel costs were to be determined on the basis of an index compiled by the Interstate Commerce Commission. This provision was never formally amended. The lease also referred to another document, the "Settlement Procedure Rules," for adjustments to fuel costs. The evidence showed that during the period in question (early 1986 through February 1989), Truck Lines sent out memos which amended the terms of compensation. None of these memos were ever formally adopted or signed. Truck Lines' evidence, and therefore its calculations on damages, was based on the last memo prior to termination. Owners' evidence and prayer was for the amount of the cash payments received by Truck Lines from the fuel supplier. The verdict was within the range of the evidence, and will not be set aside. *Beardsley v. Beardsley,* 819 S.W.2d 400, 404–05 (Mo.App. 1991).

## C. INCONSISTENT THEORIES

At the instruction conference, Truck Lines objected to the submission of both the misrepresentation and nondisclosure counts. This objection was on the basis the two were inconsistent: fraudulent misrepresentation is grounded on fraud by an affirmative statement, while the tort of fraudulent nondisclosure was based on just that, a failure to tell something. Truck Lines felt that because the two theories were contradictory, Owners should have been required to make an election of remedies.

The plaintiffs' theory on the first count was that the defendant falsely represented that the cash price they were charged was, in fact, the real price, while the second submission was based upon the defendant's failure to disclose it was getting a rebate. The trial judge allowed the submission of both, but as stated earlier in this opinion, entered only one judgment on the three rendered verdicts, not delineating which count the judgment represented.

■ The Supreme Court in *Whittom v. Alexander–Richardson Partnership,* 851 S.W.2d 504, (Mo. banc 1993), set out the difference between election of remedies and election of inconsistent theories of recovery. The purpose of the election of remedies is to prevent double recovery for a single injury. If this were Truck Lines' objection, it would

fail because Truck Lines had obviously shown no double recovery. *Id.* See also; *Carpenter v. Chrysler Corp.,* 853 S.W.2d 346, 368 (Mo.App.1993); *Orrock v. Crouse Realtors, Inc.,* 823 S.W.2d 40, 41 (Mo.App.1991). Inconsistent theories of recovery, although allowed to be pled under Rule 55.10, must be the subject of an election if the proof of one count "negates, repudiates, and disproves the other ..." and, "Courts found theories inconsistent only in all circumstances one theory disproved the other." 851 S.W.2d at 507. (A jury should not be required to find two facts which could not coexist. *Id.*) Under the facts of this case, it is difficult to see how the two counts in question could be deemed to be mutually repugnant so as to have required an election of remedies.

In any event, even if it were error to submit the two counts, the appellant Truck Lines has made no showing that the error materially affected the merits of the action. **Rule 84.13(b).**

### D. INSUFFICIENT EVIDENCE OF MISREPRESENTATION

■ Truck Lines contends Owners' evidence of fraudulent misrepresentation was not sufficient to submit, since Owners' deposition and trial testimony was inconsistent to the extent that the deposition testimony amounted to an admission, and was not cured by explanations at trial. The appellant points out that in deposition, the plaintiff-Owners stated they understood they were to be charged the cash pump price, and that Truck Lines did not represent Truck Lines' cost for fuel would be passed on to the Owners. The point continues to contrast the Owners' trial testimony, which was that Truck Lines told them the actual cost of the fuel was going to be a certain price, which would then be passed on to Owners. To quote their brief:

> "Fairly summarized, at their depositions each plaintiff admitted that no representative of (Truck Lines) ever told him that the actual cost of fuel was being passed through, while at trial each (Owner) claimed exactly the opposite—that such representation had been made."

Despite Truck Lines' assertion of a change of memory on the part of several of the Owners, it seems that the plaintiffs' had steadfastly contended the misrepresentation they complained of: Truck Lines' assertion the cash pump price was the actual cost to Truck Lines. In any event, taking as true Truck Lines' contention that Owners' testimony was contradictory between pretrial deposition and in-court testimony, this will not breathe life into this point. Our Supreme Court in *Roberts v. Emerson Electric Mfg. Co.,* 338 S.W.2d 62, 69 (Mo.1960), noted the plaintiff there had conceded in a deposition and:

> "... had testified at length and in detail he did not know what had happened on the night and morning of October 3–4. Defendant apparently contends that plaintiff should not now be permitted to take advantage of his trial testimony to the contrary in which he professed to remember and state the occurrences during that night and morning. The prior inconsistent testimony contained in the deposition, of course, affected plaintiff's credibility and the weight of his testimony, but those were matters for the jury."

*Schwartz v. Fein,* 471 S.W.2d 679, 682 (Mo. App.1971).

■ For prior contradictions or inconsistencies to totally preclude recovery as a matter of law, "they must be so contradictory and without explanation as to preclude reliance thereon." *Vaeth v. Gegg,* 486 S.W.2d 625, 628 (Mo.1972).

> "Furthermore, the rule about destructive contradictions applied only to contradictions between parts of a party's trial testimony, not to trial statements inconsistent with a deposition. Those are merely for impeachment, for the jury's consideration in weighing the party's credibility."

*Atley v. Williams,* 472 S.W.2d 867, 870 (Mo. App.1971).

### E. RELIANCE

■ An essential element in an action for fraudulent misrepresentation is the establishment that the one defrauded "relied upon the truth of the representations claimed to be false." *Empire Gas Corp. v. Small's LP Gas*

*Co.,* 637 S.W.2d 239, 242 (Mo.App.1982). In a unique, but unpersuasive argument, Truck Lines presents portions of the testimony of two of the Owners that, had they known about the rebates, they "would have really squawked," or "demanded that I get my money back," or "would have asked for my share of it." And, while admitting they thought they had a good deal with the truck leases, never did testify they would have discontinued the contract with the defendant. Truck Lines says this evidence coupled with no evidence of termination, defeats establishment of reliance, and should have prevented submission as to two of the plaintiffs, even though both men had testified they had relied on the representations made to them by Truck Lines. Truck Lines cites no common law support for its theory that the only way Owners could have made a case under this claim, would have been to have terminated the contract. In fact, Owners direct the court to a Western District opinion in *Manning v. ABC Exterminators, Inc.,* 682 S.W.2d 3, 6–7 (Mo.App.1984). In *Manning* the plaintiffs were purchasing a house pursuant to a contract which provided they be furnished with a report from a licensed company about termite activity. The defendant issued a report which indicated some prior termite activity but no structural damage. The jury found extensive termite damage and awarded actual and punitive damages for fraudulent misrepresentation. On appeal, the company made the same argument as in the case at bar—the plaintiffs were indifferent to the presence of termite damage and failed to prove reliance since they did not cancel the sale per contract language. This court said:

"We are unable to follow defendant's reasoning. We do not consider this failure to require the sellers to repair ... indicate that plaintiffs were indifferent to termite damage in general, no matter how extensive it was."

Nor, did the court find the failure to cancel, prove the termite damage actually done to the house, was immaterial merely because they went ahead with the sale. *Id.* at 7.

Oddly enough, it was Owners who were fearful of Truck Lines terminating the contract and depriving Owners of any lease income. It was not until after the contract had been terminated by Truck Lines that Owners even had the requisite knowledge of the rebates, and the amount of money involved, so it would be speculative, at best, to have required Owners to have said they would have terminated for this reason during the pendency of the contract. In addition, several Owners testified they would have been hit with substantial penalties ($2,000), had they terminated. Under the facts here, the point is denied, and it is ruled Owners made a submissible case.

## F. STATUTE OF LIMITATIONS

In this point, Truck Lines contends one of the four Owners, Moore, testified he knew within the first six months of the December 1986 start, of the Union 76 program, and that Truck Lines was receiving volume discounts or rebates. The original petition for wrongful termination was filed in June, 1989. The amended petition adding the fraud associated with the fuel rebates, was filed in September, 1991. Thus, says Truck Lines, the fraud count was beyond the five-year statute of limitations of § 516.120(5), RSMo.1986 which states:

"An action for relief on the grounds of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at anytime within ten years, of the facts constituting the fraud."

The testimony pointed to by Owners, was that Moore did have a conversation with a Truck Lines' official in the first part of 1988, regarding his paying a few cents per gallon and going back to the old program. He testified it was not until 1991 when he was told of the rebates. Either of these two dates would be within the statute.

The evidence on the dates was far from clear and not beyond dispute, making the running of the statute of limitations a jury question. *Hopkins v. Goose Creek Land Co.,* 673 S.W.2d 465, 469 (Mo.App.1984). There was sufficient evidence for the jury to determine whether the plaintiffs acted with due diligence to discover the facts constituting fraud. *Schwartz v. Lawson,* 797 S.W.2d 828,

832 (Mo.App.1990). See also: *Lehnig v. Bornhop*, 859 S.W.2d 271, 271 (Mo.App.1993). The point is denied.

## G. PUNITIVE DAMAGE SUBMISSION

■ Truck Lines attacks the submission of punitive damages, and in doing so, asks this court to overturn as unconstitutional MAI 10.01, given in this case, and to overrule certain specific cases which have found no lack of due process safeguards in that instruction. The cases are: *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 75 (Mo. banc 1990), *Wolf v. Goodyear Tire and Rubber Co.*, 808 S.W.2d 868 (Mo.App.1991), and the Eastern District's case in *Carpenter v. Chrysler Corp.*, 853 S.W.2d 346 (Mo.App. 1993). So as not to further lengthen this opinion, suffice it to say, this court is in no position, nor of the inclination to grant this requested relief. The required verdict director on punitive damages has been given the okay in the preciously cited cases, which hold 10.01 does give sufficient guidance to the jury in determining the imposition and amount of punitive damages. Also, it is beyond control at this level to disrupt the following statement of the state's highest Court in Menaugh:

> "The defendant argues that punitive damage submissions should require 'clear and convincing' evidence. This requirement is contrary to our normal requirements in the submission of civil cases. We are not disposed so to hold, or to follow cases from other jurisdictions so holding."

799 S.W.2d at 75.

Truck Lines asserts MAI 10.01 runs afoul of the language and intent of *Pacific Mut. Life Ins., Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), to the effect that the punitive damage fact finder's discretion is exercised within reasonable restraints, when proper explanation of the deterrent purpose of these damages, and the existence of proper trial and appellate court review. Truck Lines' argument that Missouri's instruction does not require the jury to reasonably relate the award to the degree and character of the wrongdoing of the defendant, is rejected. Missouri's instruction and trial and post-trial review, "comports with the Alabama system approved the United States Supreme Court in *Haslip*." *Carpenter v. Chrysler Corp.*, 853 S.W.2d 346, 366 (Mo.App.1993). All points in the Truck Lines' appeal are ruled against it.

## III. OWNERS' CROSS APPEAL ON PUNITIVE DAMAGES REMITTITUR

Owners basically present three points in their cross appeal involving the trial court's granting a remittitur of the jury's punitive damage award:

A. The trial court committed plain error in granting the remittitur because the fraudulent acts were committed by Truck Lines during the time in which the doctrine of remittitur was abolished in Missouri.

B. There was insufficient evidence supporting remittitur, and specifically, that the trial court ignored clear evidence which supported a jury belief that Truck Lines' true net worth was much greater than the $460,000 amount as testified by Truck Lines' expert.

C. The trial court erred in denying Owners' motion to reconsider its order of remittitur, based on newly discovered evidence of Truck Lines' net worth.

### FACTS

Following the February 17, 1993 verdict in this case, Truck Lines filed a motion asking the trial court to exercise its power of remittitur and reduce the jury's $4.2 million punitive damage award. Consequently, the trial court remitted the punitive damage award to $350,000, providing the following rationale for its decision:

> In reviewing the degree of harm inflicted upon Plaintiffs as a result of Defendant's conduct, the overall positive nature of the business relationship of the parties must be considered. All Plaintiffs acknowledged that Defendant was a good employer over the years who had consistently been the best source of the greatest number of compensable miles available to them. In fact, during one period, Defendant had waived a downward adjustment of Plaintiffs' compensation, although it was

entitled under the contract to pay a lower sum based on then current fuel prices. Under the totality of the circumstances surrounding Plaintiffs' claims, the Court finds the relationship of the parties to be a factor of mitigation concerning punitive damages.

Plaintiffs also acknowledged from the inception of the Union 76 program, that they were well aware of rumors that Defendant was receiving discounts on their purchases of fuel and that they could have sought employment elsewhere had they chosen to do so. Although the jury determined such rumors did not negate the element of reliance in Plaintiffs' claim for fraudulent misrepresentation, they are relevant to mitigate the degree of harm inflicted upon Plaintiffs by Defendant's conduct. Each Plaintiff was an independent contractor well versed in the ins and outs of the trucking industry. Each Plaintiff stated that had he known of the discount being received by Defendant, in all likelihood, he would have done nothing different regarding his employment except make an attempt to enforce his right and receive the discount himself.

The Court must also take into consideration that the undisputed evidence established the total net worth of Defendant to be $460,000. Plaintiffs argue that Defendant is only a conduit for a much larger holding company, but such an assertion is not supported by the evidence. Plaintiffs presented no evidence which would pierce the corporate veil and impose liability on the holding company. Therefore, the assets of the holding company are not relevant to the determination of whether or not the punitive damage award is excessive.

Owners then filed a motion for reconsideration. They argued that in remitting the punitive damages, the trial court had been misled by Truck Lines' misrepresentation of its net worth. In support of their contention, Owners referred to documents which they had obtained *after* the trial. These documents, which were appended to their motion, included an April 4, 1989 ICC (Interstate Commerce Commission) decision which stat-

ed Truck Lines' tangible net worth as of June 30, 1988 was $37.1 million, and a June 4, 1991 ICC decision resulting in a net worth as of March 30, 1991 of almost $27.3 million.

Truck Lines' response was that Owners failed to exercise sufficient diligence in obtaining information relating to net worth *before* trial; i.e., their only formal request for discovery was sustained. Owners never formally requested such information as balance sheets.

## A. WAS THE DOCTRINE OF REMITTITUR ABOLISHED DURING THE TIME WHEN THE FRAUD DOCTRINE OCCURRED?

Owners' first point on appeal is that the trial court committed plain error in ordering the remittitur of punitive damages because the cause of action for fraud by Truck Lines accrued during the time in which remittitur was abolished in Missouri. In essence, Owners say the fraudulent acts of Truck Lines, and its cause of action, occurred in the period of time when remittitur was not allowed; therefore, the trial court could not have even entertained a reduction of the jury's award. The ultimate issue, reviewed under plain error is: Where acts constituting fraud occur over a lengthy period of time, and during **part** of that time frame there was no authority allowing remittitur, is a trial judge absolutely precluded from entering an order remitting punitive damages for such fraud?

In reviewing the first issue of the acts supporting a punitive damage submission having occurred during a time when there was no recognized remittitur of such awards, it is conceded the Owners did not raise this point at trial; thus, the review is under the plain error standard. **Rule 84.13(c).**

▆▆▆ Relief under the plain error standard of review is granted sparingly, and is reserved for those situations in which hatred, passion or prejudice has been engendered, resulting in manifest injustice or miscarriage of justice. *United Services of America, Inc. v. Empire Bank of Springfield,* 726 S.W.2d 439, 444 (Mo.App.1987).

The current remittitur statute set forth in **§ 537.068, RSMo (Cum.Supp.1994),** had an

effective date of July 1, 1987.[2] Remittitur is applicable to awards of punitive damages through § 510.263(6) RSMo (Cum.Supp. 1994).[3] There was a period of time in Missouri, from June 25, 1985 to July 1, 1987 (the effective date of §§ 537.068 and 510.263(6)), when remittitur was abolished. The fraudulent acts in the case at bar occurred between early 1986 and early 1989.

Existing case law does hold that if a case "accrued" during the time remittitur was abolished, the trial court is without authority to enter an order of remittitur. *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 873 (Mo. banc 1993). Owners suggest the fraud committed by Truck Lines accrued from December 20, 1985 to July 1986, and thus, falls in the gap between the removal and reintroduction of remittitur in Missouri. Although existing precedent precludes remittitur in a case accruing before July 1, 1987, there appears to be great confusion as to exactly when a cause of action is deemed to "accrue". The dispute involves the definitions of the word "accrue" for purposes of the remittitur statute versus the definition of "accrue" for statute of limitations purposes.

### Statutes of Limitations for Fraud

The Owners cite two statutes of limitations as being applicable in a case of fraud. The general civil statute of limitations is found in § 516.100, RSMo (1986). Under § 516.100, the cause of action:

... [s]hall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, **if more than one item of damage, then the last item,** so that all resulting damage may be recovered, and full and complete relief obtained. (Emphasis added).

2. **§ 537.068** reads:
 A court may enter a remittitur order if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages. A court may increase the size of a jury's award if the court finds that the jury's verdict is inadequate because the amount of the verdict is less than fair

The more specific statute of limitations for fraud actions is § 516.120(5) RSMo (1986). § 516.120(5) states:

(5) An action for relief on the ground of fraud, the cause of action in such case to be deemed **not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud.** (Emphasis added).

The Owners claim the trial court improperly held the date of accrual of the fraud to be February 1989, two years after the reinstitution of remittitur in Missouri. They suggest the fraud committed by Truck Lines accrued in July 1986, the time of the completion of the *first* fraudulent act.

■ Owners rely on *State ex rel. Stifel, Nicolaus & Co. v. Clymer,* 522 S.W.2d 793, 796 (Mo. banc 1975). The issue in *Stifel* was whether or not a cause of action for fraud existed at the time of the filing a bankruptcy petition. If the cause of action existed at the time of the filing of the bankruptcy petition, it was an asset of the bankrupt estate and available to benefit creditors. *Id.* at 795. In the opinion, the Supreme Court of Missouri expressly held that "time of discovery ... has nothing to do with the right of recovery but relates only to whether the cause of action is barred by the applicable statute of limitations." *Id.* at 797. The court in *Stifel* limited the § 516.120(5) language; "for the purpose of determining when the statute of limitations begins to run on the cause of action for fraud, the cause of action will be treated as accruing when the fraud is discovered." *Id.* at 798. *Stifel* stands for the proposition that it is the time of the occurrence of the fraudulent event, not the time of plaintiff's discovery of the fraudulent event that controls when the cause of action "accrues" for purposes of the remittitur statute. *Id.*

and reasonable compensation for plaintiff's injuries and damages.

3. **§ 510.263(6)** reads:
 (6) The doctrines of remittitur and additur, based on the trial judge's assessment of the totality of the surrounding circumstances, shall apply to punitive damage awards.
 (Effective July 1, 1987).

More recently, this court in *Wolf v. Goodyear Tire & Rubber Co.*, 808 S.W.2d 868 held that because the accident occurred prior to the 1987 effective date of the remittitur statute, its provisions did not apply.

The final and most recent case cited by Owners is *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 873. *Callahan* again held that because the cause of action accrued during the time when remittitur was not allowed, the trial court is without authority to enter an order of remittitur. In *Stifel,* the fraudulent event was the filing of a bankruptcy petition. In *Wolf,* the cause of action grew out of an automobile accident, and in *Callahan,* an act of medical malpractice. All of these cases involved events which were single acts or wrongs in which a cause of action arose immediately upon inception, not continuing fraudulent events. It is at this point where the case at bar takes a different turn from either *Stifel, Wolf* or *Callahan.* In the instant case, the fraudulent conduct was not a one-time act of fraud by Truck Lines. The fraudulent acts were of a continuing nature, starting in early 1986, and lasting until February of 1989. Although the first fraudulent acts did indeed **start** before the 1987 effective date of the remittitur statute, the fraud continued well past the 1987 date. The evidence supported the jury's finding that the fraud continued until February 1989.

Applying the principal espoused in *Stifel* that for purposes of the remittitur statute, it is the time of the occurrence of the fraudulent event, rather than the time of discovery, we turn to the facts of the case at bar. Unlike *Stifel,* however, there is not one isolated instance of fraud, but instead, a series of acts over the years.

■ As mentioned earlier, the remittitur statute (§ 537.069) was enacted effective July 1, 1987. The legislature is presumed to have acted with knowledge of statutes dealing with similar or related subject matters. *Citizens Electric Corp. v. Director of Dep't. of Revenue,* 766 S.W.2d 450, 452 (Mo.1989). As such, the court finds no merit in Owners' argument that the statute of limitations' statute calls for a different meaning of the word "accrue" than case law allows.

■ The last date of fraud by Truck Lines on the rebate program was at the end of February, 1989. It is further noted that at trial, Owners asked for, and were awarded, damages for Truck Lines' fraudulent acts from 1986 through February 1989. This amounts to an admission that the fraud was of a long and continuous nature. Therefore, principles of equity should preclude Owners from avoiding the remittitur statute after they asked for, and received, damages during a period clearly within the remittitur statute's reach.

The court does not reach the question of what the result would be if the majority of Truck Lines' fraudulent acts fell in the gap between remittitur statutes. It might very well be a different case if the fraudulent conduct began during the period when remittitur was not allowed, but ended on July 2, 1987 (a day after the reinstitution). However, that is not the case before the court today.

Plain error is only to be involved in rare circumstances, and only then to avoid manifest injustice. *United Services of America,* 726 S.W.2d at 444. This point does not amount to one of those rare instances.

In *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the United States Supreme Court mandates a trial judge's review of a jury's punitive damage award. Here, the trial court's order of remittitur clearly demonstrates it conducted such review and found the punitive damage award to be excessive. The trial court still allowed punitive damages in an amount of nearly three times the actual damages. On these facts alone, the trial court's remittitur did not result in manifest injustice. Thus, the trial judge's granting of remittitur is not plain error.

Furthermore, even if the issue had been presented to the trial court, this court does not believe the judge would have committed an abuse of discretion in allowing the remittitur, given the long and continuing nature of the fraud committed by Truck Lines. In answer to the ultimate issue presented at the beginning of the discussion of this point, Owners' cause of action **accrued** for the purpose of the **remittitur** statute, when the last

item of damages was ascertainable (February 1989). Under these facts, the trial court had authority to entertain and grant the remittitur.

The point is denied.

## B. INSUFFICIENT EVIDENCE SUPPORTING REMITTITUR

 Review of this point, and C. *infra,* will be under the abuse of discretion standard. Authority for the abuse of discretion standard in a remittitur review action comes from *Hall v. Superior Chemical & Fertilizer, Inc.,* 819 S.W.2d 422, 425 (Mo.App.1991), where this court held that it would not disturb the order of remittitur unless it found the trial court arbitrarily abused its discretion, *Hall* at 425, citing *Lewis v. Envirotech Corp.,* 674 S.W.2d 105, 113 (Mo.App.1984). In *Larabee v. Washington,* 793 S.W.2d 357, 360 (Mo.App.1990), the first appellate case dealing with the application of the remittitur statute, *supra,* this court held an abuse of discretion occurred where the judge ordered a remittitur when the jury's verdict was not so grossly excessive as to shock the conscience of the appellate court. *Id.* at 360.

## 1. Purpose of Punitive Damages

 Punitive damages are never awarded as a matter of right, but are given at the discretion of the trier of fact for the purpose of punishing and deterring the defendant from engaging in like conduct. *Vaughan v. Taft Broadcasting Co.,* 708 S.W.2d 656, 660 (Mo. banc 1986). Because of the discretionary nature of punitive damages, the United States Supreme Court in *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), mandated the trial judge conduct a review of a jury's award of punitive damages. *Id.* at 18–19, 111 S.Ct. at 1043. The Court was concerned that punitive damage awards do not "run wild". *Id.* at 18, 111 S.Ct. at 1043. It refused to draw a "mathematical bright line" between punitive damage awards which are constitutional, and those which are not, but suggested the award did not offend due process when it was subject to review and "adequate guidance" from the trial court. *Id.* at 18, 111 S.Ct. at 1043; see also: *Wolf v. Goodyear Tire and Rubber*

*Co.,* 808 S.W.2d 868 (Mo.App.1991), where the court, like in *Haslip,* impliedly agrees that due process rights are not violated by the imposition of punitive damages as long as the jury is not given unbridled discretion. *Id.* at 874.

## 2. Factors considered in awarding punitive damages

 There are a number of factors which the jury must consider in deciding whether or not to impose punitive damages. These are malice, relationship to sustained injury, and mitigating circumstances. There are also some factors which the jury, in its discretion, **may** consider in awarding punitives, such as the net worth or financial condition of the defendant.

### a. Malice

It is generally held that the defendant must not only have intended to perform the wrongful act, but must have known it was wrongful when he did it. *Musselman v. Anheuser–Busch, Inc.,* 657 S.W.2d 282, 285 (Mo.App.1983). This knowledge requirement is met when the defendant knows the act was wrongful or that it was done with reckless disregard for the plaintiff's rights. *Oster v. Kribs Ford, Inc.,* 660 S.W.2d 348, 356 (Mo.App.1983).

### b. Relationship (nexus) to injury sustained

Although an award of punitive damages need bear no relation to the damages allowed by way of compensation, they must bear some relation to the injury inflicted and the cause thereof. *Ross v. Holton,* 640 S.W.2d 166, 174 (Mo.App.1982).

### c. Mitigating circumstances

Mitigating circumstances, those which make defendant's conduct less culpable, must be taken into consideration, and the amount must be equated to the degree of malice or criminality characterizing the actor's conduct for which punishment or determent is deemed necessary. *Pisha v. Sears Roebuck & Co.,* 496 S.W.2d 280, 284 (Mo.App.1973).

### d. Net worth or financial condition of defendant

Net worth is a discretionary factor which the jury may or may not choose to consider. In *Green v. Miller,* 851 S.W.2d 553, 556 (Mo.App.1993), this court held that the worth or financial condition of the defendant is a relevant consideration for the determination of punitive damages. However, this court has also held that while the net worth of a defendant is admissible on the issue of punitive damages, there is no requirement that net worth be shown. *Mullen v. Dayringer,* 705 S.W.2d 531, 536 (Mo.App.1985). Thus, net worth, while important, is just one factor used in consideration as affecting punitive damages. *Hupp v. North Hills Lincoln–Mercury, Inc.,* 610 S.W.2d 349, 357 n. 3 (Mo. App.1980).

### 3. Factors in granting a remittitur of punitives

▮▮▮ Once the jury has looked at the factors and decided to award punitive damages, as ordered in *Haslip,* supra, the trial judge must make a review of that award using the same factors listed above. The trial judge may conclude the award is excessive and order a remittitur pursuant to § 510.263.6. Remittitur relief does not depend upon some trial error or misconduct, but is ordered when the jury errs by awarding a verdict which is simply too bounteous under the evidence to prevent injustice. *Larabee v. Washington,* 793 S.W.2d 357, 360 (Mo.App.1990). A new trial is not required because the jury is not guilty of misconduct, only an honest mistake as to the nature and extent of the injuries. *Id.* at 360.

▮▮▮ What is excessive is to be decided on a case by case basis, but there is a general standard by which the court must abide. *Maugh v. Chrysler Corp.,* 818 S.W.2d 658, 662 (Mo.App.1991). In addition to the factors listed above, the following elements are relevant (but not necessarily mandatory) for post-verdict review:

1. the degree of malice of the act;
2. regarding the injured party:
 a) age, sex and health
 b) character
 c) injury suffered
 d) financial worth
3. regarding the defendant:
 a) intelligent, standing or affluence
 b) financial worth
 c) character
4. all circumstances surrounding the conduct including mitigating and aggravating circumstances.

*Id.* at 662, n. 2.

### 4. Appellate review of an order of remittitur.

In reviewing an order of remittitur, the trial judge is afforded broad discretion. Great discretion is afforded because the order of remittitur constitutes a ruling upon the weight of the evidence. *Hall v. Superior Chemical and Fertilizer Inc., supra,* 819 S.W.2d at 425.

▮▮▮ In the case at bar, Owners claim the remittitur was not supported by the evidence for essentially four reasons:

1) the fraud by the defendant was so blatant that it carried with it a high degree of malice such that the punitives were justified;
2) the court looked at improper mitigating factors;
3) the court relied on an improper net worth amount in ordering remittitur;
4) the court did not retain a substantial portion of the punitive damage award after remitting.

Here, the trial judge conducted a post-verdict analysis pursuant to the factors listed in *Maugh,* 818 S.W.2d at 662.

First, the trial court looked at the degree of harm inflicted upon Owners by Truck Lines. It found damage was sustained, but pointed to Owners' testimony that a positive relationship did exist between Owners and Truck Lines based upon Owners' testimony that Truck Lines was a good employer who had consistently been the best source of the greatest number of compensable miles available to them. Therefore, the overall positive business relationship between the parties served as a mitigating factor and was considered in weighing and reducing the degree of

harm done to Owners as mandated by *Pisha*, 496 S.W.2d at 284.

Second, the trial court found the degree of malice on the part of Truck Lines was mitigated by Owners' knowledge that they were well aware of rumors that Truck Lines was receiving discounts on their purchases of fuel. Therefore, Owners could have sought business elsewhere if they had chosen to do so. Mitigation based upon the degree of malice is mandated by *Oster*, 600 S.W.2d at 356.

Third, there was uncontradicted testimony as to Truck Lines' net worth. Without objection, nor cross-examination, Truck Lines' expert testified its net worth was $460,000. Owners' presented no evidence that this figure was false nor did it present evidence that Truck Lines was only a conduit of a much larger holding company. In addition, it is noted that net worth is but one factor in determining punitive damages. *Hupp*, 610 S.W.2d 349, 357 n. 3 (Mo.App.1980). Owners here made a conscious decision not to contest the issue of net worth. In the order of remittitur, the court stressed that this was a strategic decision that succeeded with the jury, but failed when the court ruled the matter. Under the mandate of *Green*, 851 S.W.2d at 556, the evidence of net worth was properly used in mitigating the injury to Owners.

With those findings, the trial court then put the punitive damage award through a "totality of the circumstances" test as requested by Truck Lines pursuant to § 510.263.6 RSMo. Under § 510.263.6, the trial court found the punitive damage award excessive because it went beyond a sum necessary to punish and deter the defendant. The court also found the jury award was excessive in relation to the actual injury inflicted and the total net worth of Truck Lines as proven at trial ($460,000). However, the court made a special effort to point out that it was retaining a substantial portion of the punitive damage award as a deterrent in deference to the jury's finding that Truck Lines' conduct was outrageous and of reckless indifference to the rights of Owners. The punitives were then reduced to $350,000, which equaled approximately three times the amount of compensatory damages, and certainly enough to punish and deter.

Under the factors of *Maugh, supra.*, the decision of the trial court to entertain and grant a remittitur, was a result of proper legal analysis and supported by competent evidence on the record. It is an adequate review of the jury's award of punitive damages as mandated by *Haslip, supra.* The trial court did not abuse its discretion in finding the award excessive and granting the remittitur. *Hall*, 819 S.W.2d at 425.

The point is denied.

### C. MOTION TO RECONSIDER PROPERLY DENIED

 A motion to reconsider is analogous to a motion for a new trial. *Eureka Pipe, Inc. v. Cretcher–Lynch & Co.*, 754 S.W.2d 897 (Mo.App.1988). A party who seeks a new trial on the basis of newly discovered evidence, must show that the evidence came to his knowledge since the trial, and that the failure of the evidence to come to his knowledge sooner was not due to the lack of his own due diligence. *Anderson v. Anderson*, 854 S.W.2d 32 (Mo.App.1993).

 In the case at bar, Owners cannot show their failure to timely learn of Truck Lines' true net worth was not the result of a lack of their own due diligence. Owners made no formal discovery request for financial statements or balance sheets; they only asked for annual reports and tax returns, and the trial court ruled that Truck Lines did not have to provide this information. That ruling was not appealed. Owners made no further effort, prior to trial, to discover or prove an amount of the defendants' net worth.

Accordingly, the burdens of production mandated by *Anderson* and *Eureka Pipe* are not met in this case by Owners.

The point is denied.

All points on both appeals are denied. The judgment is, in all respects, affirmed.

All concur.